IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 11, 2011

## PAUL DENNIS REID, JR. v. STATE OF TENNESSEE

**Circuit Court for Montgomery County**
**No. 38887**
**J. John H. Gasaway, III**

**Criminal Court for Davidson County**
**Nos. 97-C-1836 and 97-C-1834**
**J. Cheryl Blackburn**

---

**No. M2009-00128-CCA-R3-PD - Filed August 8, 2011**

**No. M2009-00360-CCA-R3-PD**

**No. M2009-01557-CCA-R3-PD**

---

Paul Dennis Reid, Jr. was convicted and sentenced to death on seven counts of first degree murder. Reid's convictions and sentences were affirmed on direct appeal by the supreme court. The instant appeals stem from evidentiary hearings wherein the Montgomery and Davidson County trial courts concluded that Reid was competent to decide on his own behalf to forego any post-conviction relief on his convictions and sentences. Following our review, we affirm the judgments of the trial courts.

**Tenn. R. App. P. 3 Appeals as of Right; Judgments of the Circuit Court for Montgomery County and the Criminal Court for Davidson County are Affirmed.**

DAVID H. WELLES, SP. J., delivered the opinion of the court, in which JERRY L. SMITH and THOMAS T. WOODALL, JJ., joined.

Bradley A. MacLean and Kelly A. Gleason, Nashville, Tennessee, for the appellant, Paul Dennis Reid, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General and Jennifer L. Smith, Associate Deputy Attorney General, for the appellee, State of Tennessee

# OPINION

## INTRODUCTION

Paul Dennis Reid., Jr., is facing seven separate sentences of death resulting from a spree of murders and armed robberies he committed over a three month period of time in the early part of 1997. On February 16, 1997, at a Captain D's restaurant in Nashville, Reid entered the store before it opened for business and shot to death the two employees. On March 23, 1997, at a McDonald's restaurant in Nashville, Reid entered the store at the close of business and shot the four employees, killing three of them. Reid was eventually identified by the surviving victim. On April 23, 1997, at a Baskin-Robbins ice cream store in Clarksville, Reid also entered the business at closing time. After robbing the store, however, Reid kidnapped the two employees; their bodies were found the next morning in a nearby park.

The Captain D's case was tried first, the Baskin-Robbins case was tried next, and the McDonald's case was tried last. Reid's convictions and sentences were all affirmed in the direct appeal process in the same order as the trials. State v. Reid, 91 S.W.3d 247 (Tenn. 2002) (Captain D's); State v. Reid, 164 S.W.3d 286 (Tenn. 2005) (Baskin-Robbins); State v. Reid, 213 S.W.3d 792 (Tenn. 2006) (McDonald's). Reid challenged his competency to stand trial in the Baskin-Robbins and McDonald's cases, however, he presented evidence regarding his mental state in the Captain D's case only in terms of mitigation during the penalty phase of the trial. In its opinions on direct appeal, the supreme court held in both the Baskin-Robbins and McDonald's cases that the evidence did not preponderate against the trial courts' findings that Reid was competent to stand trial. Reid, 213 S.W.3d at 811; Reid, 164 S.W.3d at 308.

The appeals currently before this Court arise out of post-conviction actions directly related to each of Reid's three trials. As we will explain in greater detail below, the ultimate question at issue now is whether Reid is mentally competent to decide to forego pursuit of post-conviction relief in his three cases. Reid timely filed a pro se petition for post-conviction relief in the Captain D's case. In the McDonald's and Baskin-Robbins cases, however, Reid did not file pro se petitions. Reid's sister, Linda Martiniano, is proceeding as his "next friend" in pursuit of post-conviction relief on his behalf in those two cases. Reid has stated that he does not wish to pursue post-conviction relief, and he attempted to withdraw the petition he filed in the Captain D's case.

The Davidson and Montgomery County trial courts conducted evidentiary hearings in order to determine whether Reid was competent. Following presentation of the proof, both courts found Reid to be competent. Accordingly, neither court permitted the "next friend" to pursue post-conviction relief on Reid's behalf. The petitions filed by the "next friend" in the McDonald's and Baskin-Robbins cases were, therefore, dismissed. The amended petition

filed by counsel in the Captain D's case, but unsigned by Reid, was also dismissed. Furthermore, because Reid declined to present evidence in support of his pro se petition in the Captain D's case, the Davidson County court dismissed that petition.

The cases are now before this Court on separate notices of appeal timely filed by appointed counsel and the "next friend." Given the similarity of the evidence presented at each hearing, and because the three cases involve common issues, the Court has decided to consolidate these appeals. See Tenn. R. App. P. 16(b). For ease of reference, the Court will refer to the parties on appeal as "Reid" and "the State." The Court recognizes, however, that Reid's interests on appeal are being pursued by counsel and his "next friend."

## PROCEDURAL OVERVIEW

The evidence introduced at the three trials is summarized in the supreme court's opinions in the direct appeals. See Reid, 213 S.W.3d at 805-08; Reid, 164 S.W.3d at 297-303; Reid, 91 S.W.3d at 261-71. A recitation of the facts of the crimes, however, is not necessary for our review of the issues raised in the instant appeals. Below is an overview of the procedural history of each case.

### Captain D's

Reid's post-conviction experiences began in 2003 in the Captain D's case. In its opinion issued on November 26, 2002, the Tennessee Supreme Court set an execution date of April 29, 2003. Reid, 91 S.W.3d at 288. See Tenn. Code Ann. § 40-30-120(a) (formerly 40-30-220(a)) ("When affirming a conviction and sentence of death on direct appeal, the Tennessee supreme court shall contemporaneously set a date for an execution. The date shall be no less than four (4) months from the date of the judgment of the Tennessee supreme court."). On March 26, 2003, Reid filed a pro se notice in the supreme court indicating that he did not intend to pursue post-conviction relief. In response, Reid's trial counsel filed a motion requesting the supreme court to stay the scheduled execution pending the expiration of the one year statute of limitations prescribed by the Post-Conviction Procedure Act. See Tenn. Code Ann. § 40-30-102. In an order dated April 22, 2003, the supreme court denied counsel's motion. The court noted that the Act authorized the court to set an execution date no less than four months after final judgment on direct appeal. See Tenn. Code Ann. § 40-30-120(a). The court also observed that, in response to counsel's suggestion that Reid should be evaluated to determine whether he was competent to forego post-conviction relief, Reid had already been declared competent to stand trial in both the McDonald's and Baskin-Robbins cases. The court concluded that Reid could decide on his own whether he wanted to pursue post-conviction relief.

3

Reid eventually signed and filed a pro se petition for post-conviction relief in the Captain D's case on April 28, 2003, the eve of his scheduled execution. The trial court appointed the Office of the Post-Conviction Defender to represent Reid. Counsel filed an amended petition on November 30, 2004. Counsel, however, did not ask Reid to endorse the amended petition, but instead requested the trial court to conduct a hearing to determine Reid's competency to proceed. In response, the trial court set forth in writing the procedure it would follow during that hearing. The supreme court issued an opinion in the interlocutory appeal on the matter in which it adopted a modified procedure for determining a petitioner's competency to proceed in a post-conviction action. See Reid v. State, 197 S.W.3d 694 (Tenn. 2006).

During this time, Reid wrote the trial judge on at least two occasions expressing his desire to withdraw his pro se petition. The Davidson County Criminal Court held hearings on July 31, 2007, and September 4 and 5, 2007, pursuant to the procedure set forth by the Tennessee Rules of Post-Conviction Procedure, to determine whether Reid was competent to withdraw his petition for post-conviction relief. See Tenn. Sup. Ct. R. 28, Sec. 11 (a petitioner in a capital post-conviction case is competent to withdraw a petition if the petitioner "possesses the present capacity to appreciate the petitioner's position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether the petitioner is suffering from a mental disease, disorder, or other defect which may substantially affect the petitioner's capacity"). After hearing from Reid, two mental health experts and several prison employees, the trial court concluded, in a written order filed on December 20, 2007, that Reid was not competent to withdraw his petition. The trial court recognized it had the task of deciding "whether [Reid was] being truthful or untruthful about [his] purported delusions even when mental health experts cannot reconcile when [Reid was] or [was] not being truthful. Credible evidence exist[ed] in the record to support either proposition." The trial court based its decision, in part, on the heightened scrutiny afforded petitioners in capital cases, and, in part, on the State's concession of Reid's incompetence under the same standard in parallel federal court proceedings.

The Davidson County Criminal Court subsequently held a joint competency hearing with the McDonald's case on May 12 and 13, 2008. On December 12, 2008, the court issued its written order concluding that Reid was competent and, therefore, disallowed pursuit of the unsigned petition submitted by counsel in the Captain D's case. Subsequently on May 27, 2009, following a separate hearing on the merits of the pro se petition, the court issued another order denying post-conviction relief on the grounds raised by Reid. The appeal currently before the Court in the Captain D's case involves only the trial court's ruling on Reid's competency. Reid did not appeal the dismissal of the pro se petition.

4

## Baskin-Robbins

The supreme court affirmed the convictions and sentences in the Baskin-Robbins case on May 24, 2005. Reid, 164 S.W.3d 286. On September 23, 2005, the Office of the Post-Conviction Defender filed a petition for post-conviction relief which was not signed by Reid. The supreme court, in an extraordinary appeal pursued by the State, held that the trial court could not consider the merits of the petition filed by counsel because it was not signed or verified by Reid. Holton and Reid v. State, 201 S.W.3d 626, 635 (Tenn. 2006). The supreme court ruled, however, that a post-conviction petition may indeed be filed by a "next friend" on behalf of an allegedly incompetent inmate who does not sign the petition. Id. at 634-35. In order to qualify, however, the putative "next friend" must be acting in the inmate's best interests and must put forth a prima facie showing that the inmate is presently incompetent to pursue post-conviction relief on his or her own behalf. Id.

On May 23, 2006, Reid's sister, Linda Martiniano, timely filed a petition for post-conviction relief on Reid's behalf in the Baskin-Robbins case. Following a hearing on the petition, the Montgomery County Circuit Court found that Martiniano qualified as Reid's "next friend." The trial court concluded, however, that Martiniano did not satisfy the threshold showing of Reid's incompetency and, therefore, dismissed the petition. On appeal, this Court reversed the trial court's dismissal of the "next friend" petition. Paul Dennis Reid, Jr., by and through Linda Martiniano, next friend v. State, No. M2006-01294-CCA-R3-PD, 2007 WL 1946652 (Tenn. Crim. App., July 3, 2007). This Court concluded that the trial court erred in holding that Martiniano did not satisfy the prima facie showing of Reid's alleged incompetency. The matter was remanded to the trial court for an evidentiary hearing on Reid's competence.

The Montgomery County Circuit Court held a full competency hearing on May 14 and 15, 2008. On December 18, 2008, the trial court issued its written order finding Reid to be competent, and thus dismissed the "next friend" petition. The "next friend" now appeals that ruling.

## McDonald's

The supreme court affirmed the convictions and sentences in the McDonald's case on December 27, 2006. Reid, 213 S.W.3d 792. Reid's sister, Martiniano, timely filed as "next friend" a petition for post-conviction relief on December 26, 2007. The Davidson County Criminal Court held a joint competency hearing with the Captain D's case on May 12 and 13, 2008. On December 12, 2008, the trial court concluded that the "next friend" did not satisfy her burden of proving Reid's incompetency. The trial court, therefore, dismissed the petition filed by the "next friend." The "next friend" now appeals that ruling.

Again, Reid timely filed a pro se petition in the Captain D's case, but he refused to file petitions in either the McDonald's or Baskin-Robbins cases. The ultimate question in all three of these cases is whether Reid was competent to make decisions concerning his post-conviction remedies. As the trial courts recognized, however, Reid's competency must be examined during slightly different time frames for each case. In the McDonald's and Baskin-Robbins cases, the question is whether Reid's alleged incompetence during the one year statutory filing periods permitted the "next friend" to pursue post-conviction relief on his behalf. In the Captain D's case, however, the question is whether the "next friend" may amend the pro se petition because of Reid's alleged incompetence at the time of the hearing.

The evidence introduced during the competency hearings is summarized below. As mentioned above, on May 12 and 13, 2008, the Davidson County Criminal Court conducted a joint hearing in the Captain D's and McDonald's cases. The same three mental health experts testified at both hearings: Dr. George W. Woods, Jr. (forensic psychiatrist), Dr. William Bernet (forensic psychiatrist), and Dr. Daniel Martell (forensic psychologist). During its hearing on May 14 and 15, 2008, the Montgomery County Circuit Court also heard additional testimony from Connie Westfall, a former investigator for the Office of the Post-Conviction Defender, and rebuttal testimony from Dr. Michael First (psychiatrist). Although much of the testimony is the same, we have decided to summarize the evidence from each hearing separately.

## Davidson County cases
### (Captain D's and McDonald's)

Dr. George W. Woods, Jr. testified on behalf of Reid as an expert in neuropsychiatry. Dr. Woods interviewed Reid for the first time on August 18, 2005. He also saw Reid October 6, 2005, June 20, 2006, November 30, 2006, March 29, 2007, April 26, 2007 and December 11, 2007. In addition to conducting his own interviews of Reid, Dr. Woods reviewed the reports of others, including Connie Westfall and Drs. Martell and Bernet, who had contact with Reid.

Dr. Woods testified that Reid, in December 2007, was delusional and had fixed false beliefs that were unshakeable. Reid's core delusion was that he had been monitored both by video and audio sources since 1985 by a government agency called "scientific technology." The so-called "scientific technology" monitored his behavior and controlled most aspects of his bodily functions. Reid believed the "scientific technology" controlled the legal system so that everything about his cases was scripted and everyone involved was coached about what to say. According to Dr. Woods, Reid believed his attorney were actors, his trials were

6

mock and that he was serving a ten or twelve year sentence as the result of a deal negotiated by attorneys in Washington, D.C. and New York. Reid also maintained a delusion that he was to marry a fictitious woman named April or Susan to whom he would leave all of his money.

Dr. Woods testified that Reid's delusional psychotic state had deteriorated since the time he first met Reid in August 2005. Dr. Woods testified that Reid was able to report events which occurred in his legal proceedings but that he often was able only to parrot basic information regarding the process. Although Dr. Woods stated that Reid understood he was in the post-conviction stage, Reid did not understand significant aspects of the proceedings. Reid understood he was facing the death penalty, however, he did not otherwise believe he would be executed because he believed he had a fixed sentence and would be released and receive a large sum of money. According to Dr. Woods, Reid's delusions are clearly evidenced in the pro se petition he filed in the Captain D's case. Reid references government mind control and his belief that "scientific technology" prevented him or his attorneys from raising the concerns he was able to later present in his pro se post-conviction petition.

Dr. Woods testified that Reid had some basic recognition of his legal rights and liabilities; he understood he was convicted, had appealed and was now in the post-conviction stage. Dr. Woods stated, however, that Reid did not understand that the various mental health experts had different opinions about his competency or that his sister, Ms. Martiniano, was pursuing relief on his behalf. Dr. Woods also stated that Reid did not want a new trial because he believed the result would be the same because the witnesses would lie on the stand. According to Dr. Woods, Reid only wanted a new trial if he could reveal evidence about the "scientific technology." Reid believed the tape recordings made by scientific technology would prove his innocence. Considering the impairment caused by his delusions, Dr. Woods differentiated between Reid's recognition of the legal process versus his understanding of his rights. Dr. Woods testified:

> And so when we look at the rote kinds of things he can understand – and, again, I really want to clarify that I'm not saying that Mr. Reid has absolutely no ability to understand these processes and no ability to at least . . . walk through some of these. When we look at the way his delusions capture his judgment and inform his behavior – and, again, the idea of Mr. Reid being able to file a petition is one thing. The fact that he files a petition in April of 2003 that goes on to note, 'My lawyers were scripted by the government military and told to get me out of the way,' explains how those delusions, once you get past the parroting of knowing the process, explain how those delusions impact his legal rights and responsibilities.

Accordingly, Dr. Woods opined that Reid did not have a meaningful understanding of his legal rights and liabilities. Dr. Woods suggested that managing one's personal affairs necessarily included managing one's legal affairs. Dr. Woods opined that Reid did little to manage his legal affairs. According to Dr. Woods, Reid did not read anything related to his cases. Dr. Woods acknowledged that Reid could manage menial tasks such as brushing his teeth, eating, exercising and purchasing items from the prison commissary. Dr. Woods commented on the fact that Reid was in a structured environment in prison. Reid could also discuss current events. Dr. Woods stated, though, that Reid believed "scientific technology" oftentimes affected his health and his ability to eat, sleep, and read. Dr. Woods ultimately opined that Reid was unable to manage his personal affairs.

During cross-examination, Dr. Woods testified that Reid suffered from grandiose, persecutory and paranoid delusions. Dr. Woods said Reid's delusions had a bizarre quality, but they were not the result of schizophrenia. Dr. Woods opined that Reid suffered from delusions that were secondary to his brain dysfunction, that is, his atrophied left temporal lobe. According to Dr. Woods, Reid's delusions were not the result of psychosis, but rather were organic in nature and caused by his brain dysfunction. Dr. Woods testified that studies have shown some individuals with brain damage similar to Reid's have reported delusions, while others have not.

Dr. Woods stated that Reid admitted in the past to having fabricated his delusions. Dr. Woods also acknowledged that, although there was evidence that Reid had brain damage, there was no true scientific test to determine whether his delusions were real. Dr. Woods stated, though, that several tests administered by other mental health experts showed that Reid was not malingering.

Dr. Woods testified that he found the pro se petition filed by Reid to be very relevant in terms of his diagnosis. Dr. Woods stated that the foundation of the grounds for relief was based upon Reid's delusions. Dr. Woods acknowledged during cross-examination that Reid had a basic understanding of the history and status of his cases, enough so that he could identify legal concepts such as the statute of limitations for filing a post-conviction petition, previously determined claims, Brady violations and ineffective assistance of counsel. Dr. Woods stated, however, that Reid's behavior and judgment filtered through his delusions.

Dr. Woods acknowledged during cross-examination that Reid knew about the book The Warrior's Edge which discussed Soviet-era mind control projects. Dr. Woods did not conduct an independent investigation to determine whether Reid's alleged fiancé existed. Dr. Woods acknowledged that Reid was able to maintain a relatively normal life outside of prison. He testified, however, that Reid's delusions were encapsulated then. According to Dr. Woods, Reid's organic delusions evolved over time. Dr. Woods testified that personality

8

disorders go away but delusions continue to get worse. Regarding Reid's understanding of his legal rights, Dr. Woods stated that Reid could not make rational decisions because his delusions impacted both his judgment and his behavior. Dr. Woods testified that Reid was not completely delusional all the time and that he could grasp certain facts about his cases.

When questioned by the trial court, Dr. Woods stated that, in his professional opinion, Reid was not competent during the statute of limitations period for filing a post-conviction petition in the McDonald's case or at the time of the joint evidentiary hearing.

Dr. William Bernet testified on behalf of the State as an expert in the field of forensic psychiatry. Dr. Bernet interviewed Reid twice in January 1999, once in September 1999, twice in February 2007 and once in April 2008 prior to the evidentiary hearing. Dr. Bernet also reviewed the numerous reports compiled about Reid's medical history, including those from about thirty different mental health professionals.

In addition, Dr. Bernet interviewed prison personnel in preparation for his evaluation of Reid. According to prison officials, Reid behaved appropriately, cooperated with requests, and was cordial and friendly. Dr. Bernet stated he asked one official at Riverbend in April 2008 if Reid had made any comments about "scientific technology." The official responded that he had heard Reid talk about that "years ago" but he had not heard any such comments "in a long time." Dr. Bernet said it was significant that a prison official did not observe Reid exhibiting any significant psychological problems. According to Dr. Bernet, Reid was diagnosed by a prison psychiatrist in April 2008 as suffering from adjustment disorder with depressed mood as well as antisocial personality disorder. At that time, Reid was being prescribed antidepressant medication.

Dr. Bernet testified that Reid's condition had not changed between his February 2007 and April 2008 meetings. Dr. Bernet stated that Reid was friendly, affable, and talkative. Dr. Bernet acknowledged that Reid continued to talk about his ideas concerning government surveillance. Following his April 2008 interview of Reid, Dr. Bernet concluded that Reid was competent to manage his personal affairs and understand his legal rights and liabilities. According to Dr. Bernet, Reid understood that the purpose of a post-conviction hearing was to gain a new trial, but he also understood that his death sentence would go into effect if he was unsuccessful in post-conviction. Dr. Bernet stated that Reid also understood the differences between a direct appeal of a conviction and a post-conviction proceeding.

Dr. Bernet acknowledged that Reid had ideas about government surveillance and "scientific technology." Dr. Bernet believed Reid used the idea of government surveillance as a defense mechanism against the bad thoughts he had about the crimes he committed. Notwithstanding those ideas, Dr. Bernet testified that he questioned Reid about whether he

wanted new trials. Reid told Dr. Bernet he did not want new trials because he had already been tried and convicted by three different juries and he did not want to put himself or his family through that ordeal again. According to Dr. Bernet, Reid had a high opinion of himself, but he also valued what other people thought about him. As such, Dr. Bernet stated that Reid did not want to be humiliated at another trial. Dr. Bernet also testified, however, that Reid talked nonsense at times during the interview. For example, Reid told Dr. Bernet that only "five people" in Nashville thought he was actually guilty of the crimes he committed.

Dr. Bernet testified that Reid's decision to forego further challenges to his convictions was an important decision to Reid and he wanted to make it for himself. According to Dr. Bernet, Reid did not want anyone to attempt to change his mind in that respect. Dr. Bernet believed that Reid was able to discuss his legal rights and liabilities without the influence of the ideas of government surveillance. Dr. Bernet said Reid made things up that were either helpful to him or made him feel better. Dr. Bernet believed Reid had a history of lying since his teenage years. Dr. Bernet testified that Reid told him he had fabricated psychiatric symptoms in the past including having made up stories about government surveillance. Dr. Bernet questioned Reid about why he had perpetuated ideas about government surveillance after he was released from prison in 1990. Reid told Dr. Bernet that he wanted to straighten out his life at that time, and part of that goal was trying to get his convictions set aside. Reid told Dr. Bernet that he had success before obtaining not guilty verdicts by reason of insanity. According to Dr. Bernet, Reid was using the idea of government surveillance to benefit his position.

According to Dr. Bernet, Reid delved into his stories about government surveillance and scientific technology if he thought the person to whom he was talking at the time seemed interested in listening. Dr. Bernet testified that Reid generally enjoyed engaging people in conversations. Dr. Bernet also said Reid discussed topics during their interview which did not involve stories about government surveillance. Dr. Bernet testified that Reid put a lot thought into the decisions he made about his daily activities. According to Dr. Bernet's impression, Reid considered exercising and maintaining a healthy diet important. Reid also made it a point to watch educational programming on television. Dr. Bernet explained his opinion about Reid:

> I guess what I'm trying to say is that Mr. Reid uses fantasy in making up stories and then telling these stories in a very adaptive way. This is [a] defense mechanism. It's a psychological defense mechanism that protects him from very, very unpleasant ideas and unpleasant feelings. That's very helpful to people. We all use defense mechanisms, although, most people don't use the ones that he uses. And I think that the government surveillance idea

protects him against the idea that he killed people and that he was found guilty of killing seven people. Because it's very simple that if only that government surveillance could be located, it would prove that I didn't do it. And so I think that fantasy is very useful to him. I think the fantasy about Susan is useful in sort of thinking about the future. . . . Mr. Reid has bad prospects for the future. . . . [H]e's either going to be in prison, or he's going to be executed. This is a horrible thing to have to think about. Who would want to think about stuff like that? And if you're in prison, you create ways to have more pleasant thoughts. And if it means making up an idea about a woman that you're in love with, to me that's a perfectly sensible and adaptive mechanism. . . . [T]here are a lot of defense mechanisms that are healthier and more mature than what he does, but to him they're very useful. And I think it's interesting that one of them mainly focuses on the past, and the idea of getting married sort of focuses on the future. But I just think that they're not delusions in the sense that we usually think of delusions. They're more – I would describe them more his thoughts and fantasies that he then tells other people. He shares them with other people, and at that point they become fabrications because he's making up something that he's telling other people and pretending that it's factual. . . . [T]hat's how I conceptualize what's going on with Mr. Reid.

Dr. Bernet acknowledged that Reid had atrophy of the anterior part of his left temporal lobe. He also testified that about five percent of individuals with brain damage have delusions. According to Dr. Bernet, however, people who have delusions usually keep them to themselves and attempt to discover the source of the delusions. Dr. Bernet placed emphasis on the fact that Reid told various mental health professionals that he had fabricated the stories about government surveillance. Dr. Bernet disagreed with Dr. Wood's opinion that Reid's mental state had worsened because, according to Dr. Bernet, Reid told stories about government surveillance when he was twenty years old. Dr. Bernet testified that the course of Reid's psychotic symptoms coincided with his legal troubles. Dr. Bernet stated that there were some aspects of Reid's history that appeared to suggest delusions, but he ultimately stated that Reid more likely fabricated the stories of surveillance. Dr. Bernet believed Reid was competent under the Nix standard.

Dr. Bernet acknowledged during cross-examination that the prison officials with whom he had discussed Reid's mental condition only had occasional contact with Reid. Dr. Bernet also admitted that his opinion of Reid in January 1999 was that Reid suffered from delusional disorder which developed gradually between 1986 and 1993. Dr. Bernet considered the possibility that Reid was malingering at that time but concluded instead that the symptoms associated with delusional disorder were legitimate. Although Dr. Bernet

11

described Reid as a pathological liar, he later abandoned that particular terminology because of the confusion it caused. Dr. Bernet maintained that Reid was a repetitive or persistent liar.

Dr. Bernet testified that Reid used his lies about government surveillance as a defense mechanism against the fact that he killed seven people. Dr. Bernet did not think, however, that Reid always believed he was being controlled by "scientific technology": "I think at times he seems to have insight. I think [for] some of the lies he tells he has insight. There may be other times when he doesn't have insight, and it's something he truly believes." According to Dr. Bernet, Reid's use of the defense mechanism, his notion of government surveillance, was partly unconscious. Although Dr. Bernet stated that he was "open to consider" the possibility that Reid suffered from a delusional disorder, he was more persuaded that Reid was malingering. Dr. Bernet testified, though, that defense mechanisms and delusional disorders are not mutually exclusive. Dr. Bernet acknowledged that certain types of defense mechanisms are psychotic.

According to Dr. Bernet, Reid understood that he had some brain atrophy which affected his language and processing. Dr. Bernet further testified on cross-examination that Reid believed "scientific technology" had recorded all of his actions and that tapes existed which would prove his innocence. Dr. Bernet also testified that Reid believed "scientific technology" had the ability to control his thoughts and memory and could also cause him physical pain and discomfort. Dr. Bernet acknowledged as well that Reid believed "scientific technology" controlled his legal proceedings. Dr. Bernet noted that the numerous mental health professionals who had evaluated Reid since 2003 reported Reid's reference to government surveillance but that none mentioned that Reid had renounced or denied his belief in "scientific technology." Dr. Bernet commented on the fact that Reid was prescribed antipsychotic medications while imprisoned in Texas during the 1980s and the fact that two of the side effects of the medications were motor restlessness and involuntary spasms of the upper body, tongue, throat and eyes. Dr. Bernet also noted that, around the time of the hearing in this case, Reid was locked in his cell twenty-three hours a day and was physically isolated from other people during the one hour he was outside his cell. Dr. Bernet acknowledged that Reid's meals were delivered to him in his cell.

During cross-examination, Dr. Bernet testified that Reid was confused about some aspects of his cases. Reid confused hearings related to his competency with hearings related to the underlying facts and issues. Dr. Bernet believed, though, that Reid was able to discuss the pros and cons of pursuing post-conviction relief without significantly referring to "scientific technology." Reid believed exposing the "scientific technology" tape recordings of his life would benefit him. According to Dr. Bernet, however, Reid did not want new trials because either he thought the results would be the same because of his delusional belief about "scientific technology's" control over the proceedings, or because he consciously or

12

unconsciously used the idea of "scientific technology" as a defense mechanism against what actually happened. Dr. Bernet adhered to the latter theory. Dr. Bernet admitted that some of Reid's statements, taken by themselves, sounded like he was delusional.

In response to a question from the trial court about Reid's condition, Dr. Bernet acknowledged that Reid was either a non-psychotic prevaricating individual who sometimes pretended to be delusional or he was severely psychotic and sometimes pretended to be totally free of his delusions. When the trial court asked Dr. Bernet whether Reid understood his legal rights and liabilities, however, Dr. Bernet responded:

> To me he gave logical responses to the discussion of why he did not want to have a new trial, and it all made sense. And it would even make sense if he had this delusion going on. It would still make sense to me. I don't think he actually has this delusion going on, so to me that's not such a big hurdle to approach. But to me his discussion of his day-to-day life, his discussion of the post-conviction hearing, the discussion of the pros and cons of a new trial, that most of that he was able to carry on in a logical way without any reference to whether – the delusion or the belief system. So I would find it harder to make that judgment about being competent if I – frankly if I truly thought he was delusional, it would be harder for me to be convinced that he is competent.

Dr. Bernet stated it was easier for him to conclude Reid was competent because he did not think about Reid "in terms of being delusional." Regarding his belief that Reid fabricates the stories about government surveillance, Dr. Bernet testified:

> that just fits into my idea that [Reid] has a very kind of firmly held defense mechanism that to him is very important. And to me it's so adaptive I wouldn't want to see people try to take it away. So to me [Reid] can put that aside enough that he can talk coherently about his situation.

Dr. Bernet opined that Reid was competent as it related to both the Captain D's and McDonald's post-conviction proceedings. Dr. Bernet surmised:

> I feel that he has understood fundamentally all along that it's not in his interest, in his perceived interest, to do this all over again. So I think he's been consistently feeling that way and that he has been consistently telling people that. And when people bring up the issue, he is very uncomfortable with it. So he talks about the government surveillance as a way to not face those issues.

13

During re-direct examination by the State, Dr. Bernet explained that, aside from one reference, there was no record in the prison clinical files which he reviewed where Reid referred to the idea of government surveillance. Dr. Bernet explained:

[Reid] chooses his audience. I think he talks about government surveillance to people who are interested in it and who [sic] somehow that pertains to their part of his life. And I think he has enough sense not to talk to the [prison] clinicians about it because, first of all, it isn't really part of his life that pertains to his real psychiatric condition. And I think he probably knows that he doesn't need to be on antipsychotic medications. So I think he has enough sense to choose his audience, which is part of the whole fabrication idea, that he chooses his audience that's interested in government surveillance and scientific technology ideas and he talks a lot to them but to other people he doesn't.

Dr. Daniel Martell, a board-certified forensic psychologist, also testified on behalf of the State. Dr. Martell stated he had a long history with Reid and had interviewed him a number of times over the years since 1999, with the most recent occurring on April 22, 2008, for about six and a half hours. Dr. Martell testified that when he interviewed Reid in 2006, he found Reid to be "acutely disturbed." During the 2008 interview, however, Dr. Martell stated Reid was better but still evidenced signs and symptoms of the delusional disorder. Reid had been prescribed an antidepressant which he had been taking for approximately one year. Reid told Dr. Martell that the medication helped him feel less depressed.

According to Dr. Martell's impression from the 2008 interview, Reid was fit, well nourished, well groomed and possessed "a somewhat obsequious and overly friendly interpersonal style." Dr. Martell said Reid continued to express grandiose and narcissistic ideas about himself and believed that everyone in Nashville knew about the alleged government surveillance and "scientific technology." Dr. Martell also stated that Reid believed events, such as the mental health evaluations, were being repeated. Reid informed Dr. Martell that he believed he actually received a ten to twelve year sentence to serve at eighty percent. Reid believed his trials were mock trials. He also believed that he was engaged to a woman named Susan who worked for the Attorney General's Office.

Dr. Martell testified that during the 2008 interview Reid was able to discuss current events, including a recent court case concerning lethal injection. In 2006, Dr. Martell opined that Reid was in acute exacerbation of his disorder. Although Dr. Martell believed Reid still suffered from a mental disorder, Dr. Martell's impression from the 2008 interview was that Reid was exaggerating his symptoms more. Dr. Martell diagnosed Reid with a delusional disorder with both persecutory and grandiose content, a mild neurocognitive disorder, and

antisocial personality disorder. Those were the same diagnoses Dr. Martell found prior to trial.

Dr. Martell testified that this case presented a special challenge regarding his opinion about Reid's ability to manage his personal affairs because Reid, as a death row inmate, had very little opportunity in his life to show his capacity to manage his affairs since many of his affairs were managed for him. Dr. Martell further testified, however, within that limited context and with that caveat Reid did report being able to manage daily activities. According to Dr. Martell, Reid dressed himself, groomed himself and maintained good personal hygiene, diet and fitness. Reid also made decisions about his personal and recreation time. And although Dr. Martell testified that Reid was able to manage his prison inmate account, he was concerned about Reid's desire to will his belongings to a delusional girlfriend.

Dr. Martell testified that Reid understood his fundamental rights. Reid knew he had the right to counsel and the right to pursue post-conviction relief. According to Dr. Martell, Reid was able to describe the procedural history and current status of his three cases. Reid knew the names of the judges and attorneys involved. He understood that if he was successful in post-conviction he could possibly be granted new trials, but if he was unsuccessful the cases would moved toward imposition of final punishment. Dr. Martell stated that Reid understood the legal concept of ineffective assistance of counsel and he believed he had valid challenges to certain evidence which was introduced against him at trial.

Dr. Martell testified that since their first meeting Reid had always maintained that he did not want to pursue post-conviction relief in any of his cases. Dr. Martell did state that when he interviewed Reid in 2006 he believed Reid's reasons for not wanting to pursue such relief were delusional. Following the 2008 interview, though, Dr. Martell believed Reid was able to understand his legal rights and liabilities.

Dr. Martell testified on cross-examination that the purpose of his 2006 evaluation of Reid was for a competency determination under the Rees standard. Dr. Martell opined that Reid was suffering from an acute exacerbation of his delusional disorder at that time. Dr. Martell further opined that Reid's delusions were no longer encapsulated, as they had been in 1999, and that they had grown to incorporate his attorneys and others in his immediate environment. During cross-examination, Dr. Martell acknowledged that Reid continued to discuss his delusional beliefs in the 2008 interview. Dr. Martell described that many of his findings following the 2006 evaluation remained the same in 2008. According to Dr. Martell, Reid informed Dr. Martell in 2008 that his attorneys were actors who were being manipulated by "scientific technology."

15

Dr. Martell acknowledged during cross-examination that Reid believed he was under constant surveillance by "scientific technology." Dr. Martell also acknowledged that Reid believed recordings existed which would help prove his innocence in these cases. Dr. Martell testified, however, that Reid's delusional beliefs did not necessarily affect his understanding of his legal rights and liabilities. According to Dr. Martell, Reid's ability to understand his rights and liabilities fluctuated based on the acuity of his delusions at various times. Dr. Martell stated that Reid's belief that his trials were mock and his attorneys were actors would have a bearing on his understanding of Reid's condition, as would Reid's belief that he would be released from prison in ten to twelve years and marry a woman named Susan.

When questioned whether Reid had an accurate understanding of the history of his cases, Dr. Martell stated that "there's degrees of accuracy. . . . [Reid] could be factually incorrect [about]parts. But the big broad brush picture he certainly gets." Dr. Martell testified:

> I think patients with this disorder are always struggling against . . . the degree to which they can keep it in the suitcase and the degree to which it's coming out and interfering with their life. And I think that's what's reflected here is his struggle between how active are they going to be – when I saw him two years ago [2006], he was actively acting out, suffering from the delusions. This time [2008], maybe not so much. He was working on getting them back in the suitcase. That's my analogy.

During redirect examination, Dr. Martell testified that, at the time of his most recent interview with Reid, Reid was able to manage his personal affairs and understand his legal rights. Dr. Martell stated, though, that in 2006 Reid was "as sick as [he had] seen him." Dr. Martell explained that "[t]he natural course of the disorder is that it waxes and wanes. Like most mental disorders, they're not a constant steady state. You have periods where it gets worse and periods where it gets better." Dr. Martell attributed Reid's condition in 2008 to the decrease in the level of Reid's stress by being house at Riverbend versus Brushy Mountain. When questioned by the trial court about the relevant statutory time frame in the McDonald's case, Dr. Martell opined that Reid retained a "substantial capacity to appreciate his legal position." Dr. Martell testified that Reid's condition improved over time from 2006, when he was at his worst, through 2008, when he was not as delusional. Dr. Martell's opinion about Reid's decision not to allow counsel to amend the pro se petition in the Captain D's case, however, was not a rational one. The trial court questioned Dr. Martell about the difference between his and Dr. Bernet's diagnoses:

16

It's a very difficult differential, and I respect his opinion. The things I find most compelling that support my coming down on the other side is the psychological testing. I put a lot of credence in it, and I find that it correlates nicely with periods where's he's confessed to exaggerating. And indeed he does exaggerate. He can and does manipulate the testing, but there have been times, for example when I first saw him at the time of trial, it was valid and there was no evidence of psychopathology. It was completely within normal limits. When I saw him in 2006, again, the testing was valid. It was not exaggerated, but it clearly showed evidence of delusional disorder and even called out that diagnosis. And I find that compelling. Now, at the present time it's a mixed bag. I believe he really has the disorder because of that. But what exactly is going on now – like I've said, I think he's getting a handle, it's going back into remission . . .

Dr. Martell testified that there was no way to know when Reid's delusional disorder would go into or come out of remission.

**Montgomery County case**
**(Baskin-Robbins)**

Dr. George W. Woods, Jr., a licensed psychiatrist, testified on Reid's behalf as an expert in the field of neuropsychiatry. Dr. Woods interviewed Reid, for purposes of the evidentiary hearing in Montgomery County, on three separate occasions: August 18, 2005, October 6, 2005, and June 20, 2006. As part of his evaluation of Reid, and in order to gain an understanding of the nature of the communications between Reid and counsel, Dr. Woods reviewed the statements of various individuals associated with Reid's legal team who had contact with Reid during the applicable statutory period, May 2005 to May 2006. Dr. Woods also reviewed the numerous medical reports from Reid's past. Dr. Woods compiled written evaluations of Reid on May 22, 2006, and again on June 22, 2006.

Dr. Woods opined that Reid was psychotic and suffered from paranoid delusions. According to Dr. Woods, Reid was not malingering about his fixed false belief system. Although Dr. Woods believed Reid's delusions were more encapsulated before 2005, they began to deteriorate and affected more of his life into 2005 and 2006. Reid's delusion was one of control. He believed that a government agency called "scientific technology" monitored his every movement and controlled his physical, emotional and intellectual functioning. According to Dr. Woods, "scientific technology" impaired Reid's ability to eat, sleep and remember.

17

Because of these delusions, Reid believed his attorneys were actors hired by "scientific technology" and that other individuals involved in his legal proceedings, including the trial judge, had been coached about what to say. As such, Reid believed there was no reason to get involved in his criminal cases because the outcome had already been scripted. Reid believed that everyone involved in his criminal cases were intent to see him executed because he was close to exposing "scientific technology." According to Dr. Woods, Reid viewed his current criminal proceedings as simply mock trials. Dr. Woods attributed this view to Reid's delusional beliefs.

Dr. Woods testified Reid was not rendered totally incoherent by his delusional belief system. Reid's ability to understand and express language, however, was impaired. Reid used nonsensical words, or neologisms, which is often found to be a symptom in psychosis. Reid also had difficulty registering and recalling memories. Dr. Woods also testified that the left temporal lobe of Reid's brain is atrophied, meaning it had withered away. Dr. Woods stated that this brain dysfunction produced the chronic, schizophrenia-like psychosis which had severely impaired Reid's ability to weigh, deliberate, inform and cooperate. Reid also had impairments in his ability to sequence his memories and developed delusional precepts in order to explain his misperceptions.

Dr. Woods concluded that Reid did not understand his legal rights and liabilities. Dr. Woods' conclusion was based upon Reid's delusional belief that "scientific technology" had scripted the outcome of his criminal cases and Reid, therefore, saw no reason to become involved in his own behalf. According to Dr. Woods, Reid believed neither his lawyers nor anyone else participating in these proceedings were allowed to disobey the mandates of "scientific technology." Dr. Woods also concluded that Reid was unable to manage his personal affairs. Although Dr. Woods stated that Reid could brush his teeth and exercise and buy items at the prison commissary, he conditioned that statement on Reid's belief that "scientific technology" controlled everyone at the prison with whom he came into contact on a daily basis.

On cross-examination, Dr. Woods acknowledged that in the past Reid had told mental health professionals that he fabricated his delusions. Dr. Woods testified, though, that Reid could have been psychotic despite his own claims of malingering. Dr. Woods testified that he always believed Reid had suffered from delusions. Dr. Woods believed Reid had consistently not wanted to be deemed incompetent or mentally ill. Dr. Woods also testified during cross-examination about Reid's knowledge of The Warrior's Edge, a 1990 book which described mind control experiments that allegedly took place in the Soviet Union. Dr. Woods said he did not interview any prison employees who interacted with Reid during the statutory period of time in question.

Connie Westfall, an investigator formerly employed by the Office of the Post-Conviction Defender, testified on Reid's behalf. Westfall was assigned to Reid's cases in May 2003, and she maintained regular contact with Reid until her retirement in April 2008. According to Ms. Westfall, she visited Reid for about two hours every other week. Ms. Westfall was directed by counsel to monitor Reid's mental state and attempt to develop a line of communication and trust to the extent possible. As such, she took detailed notes to record any changes she witnessed in Reid's physical condition and mental and emotional state. The summary of those notes were memorialized in an affidavit which was introduced as an exhibit to the competency hearing. Ms. Westfall was also directed to monitor Reid's living conditions, to interface with prison officials on his behalf, and to develop and maintain a relationship with Reid's family. Westfall explained that Reid was locked in his cell twenty-three hours a day while housed at Brushy Mountain State Prison in Morgan County. During his one hour recreation time, Westfall testified Reid was not allowed to interact with other inmates. She described his life at Brushy Mountain as austere.

Ms. Westfall testified that when she first met Reid he was polite and outgoing. Ms. Westfall testified that Reid wanted to project himself as being very intelligent. She stated, though, that Reid would misuse words during their conversations. She stated they were able to engage in conversations, but stated that changed dramatically over time. Ms. Westfall described Reid's belief that he was controlled by "scientific technology." Reid told Ms. Westfall that "scientific technology" could see through his eyes and could replace his memories with other memories. Ms. Westfall testified that Reid accused her of being controlled by "scientific technology" because she could not get him transferred from Brushy Mountain back to Riverbend Maximum Security Institution in Nashville. Reid also believed Ms. Westfall was controlled by "scientific technology" because she allegedly repeated certain words or phrases during their visits. Ms. Westfall further testified that Reid also believed all the hearings he attended in his criminal cases were simply repeated events. Reid believed everyone in the prison system was controlled by "scientific technology" and that they had the ability to make Reid do things he did not want to do.

Ms. Westfall testified that Reid would try to outsmart "scientific technology" at times by doing something other than what he thought they wanted him to do. According to Ms. Westfall, Reid ultimately believed the only way to escape the mind control of "scientific technology" was to face execution. Reid saw execution as a way to end the torture and to beat "scientific technology" at their own game, hence his refusal to pursue post-conviction relief. Ms. Westfall testified that Reid was intently focused on revealing the truth about "scientific technology." To that end, Ms. Westfall stated that Reid did not want to discuss his criminal cases with his attorneys, but instead wanted to his attorneys to help investigate the source of "scientific technology." Reid believed that he would actually be set free and receive a cash settlement once it was revealed that "scientific technology" was behind

everything. Ms. Westfall testified that neither she nor counsel were able to conduct a meaningful or rational conversation with him about his cases during the applicable statutory period. According to Ms. Westfall, Reid was so steadfast in his belief about "scientific technology" and its plan to control the outcome of his cases that he refused to discuss anything about them.

According to Ms. Westfall, Reid watched television regularly and was aware of current news events. Reid could not, however, carry on any real in depth conversation about those events. Reid even believed "scientific technology" was behind certain news events. Reid complained to Ms. Westfall about ringing sounds in his ears and he believed "scientific technology" turned up the volume of those sounds to punish him for talking to his lawyers. Reid also complained about seeing purple and green dots and having an orange taste in his mouth. Reid told Ms. Westfall that "scientific technology" first appeared in his life while he was imprisoned in Texas in 1985. Ms. Westfall testified that Reid enjoyed life before 1985. Reid, however, believed "scientific technology" made him violent and portrayed him in a negative light. Ms. Westfall testified that Reid has never denied or renounced his belief in scientific technology.

Dr. Daniel A. Martell testified on behalf of the State as an expert in the field of clinical psychology. Dr. Martell first became involved with Reid's cases in 1999. Dr. Martell was also retained by the State in 2000 specifically to evaluate Reid's competency to stand trial in the McDonald's case. Dr. Martell was again retained by the State in August 2006 to conduct a competency evaluation of Reid pursuant to the Rees standard.

In 1999, Dr. Martell diagnosed Reid with a delusional disorder with grandiose and paranoid features that at the time was in substantial remission. Dr. Martell also concluded that Reid had minimal brain dysfunction and antisocial personality disorder. Similar to the other witnesses, Dr. Martell stated that Reid believed the government had been surveilling his activities and controlling him with "scientific technology" since the mid-1980s. Dr. Martell concluded that Reid was competent to stand trial in the McDonald's case in 2000 because his delusional disorder was in substantial remission. Following his August 2006 evaluation, however, Dr. Martell testified that Reid's delusional disorder was no longer encapsulated.

Dr. Martell testified about Reid's history of malingering. Dr. Martell also commented on the letters Reid wrote to various individuals, including the President and governor of Texas, complaining about "scientific technology." According to Dr. Martell, those letters suggested that Reid really did have a delusional disorder despite Reid's own admissions that he lied at times. Dr. Martell did not diagnose Reid as a malingerer. In fact, according to Dr. Martell, the several tests he administered to detect malingering were negative.

20

Qualifying his testimony with the caveat that he interviewed Reid in August 2006, approximately three months after the running of the statute of limitations, Dr. Martell testified that Reid's delusional disorder was the worst that it had been. Dr. Martell further testified, however, under the applicable Nix standard that Reid "retained a substantial capacity to appreciate his legal position." Dr. Martell stated that Reid had a similar appreciation when he evaluated Reid in 1999 and 2000. According to Dr. Martell:

> He's always, over the times I've seen him, had an eloquent and rich understanding of the charges against him, of what's going on with his cases; his delusions have never interfered with his capacity to understand the processes or the charges. [It has] interfered with some of his thinking about evidence he might put into play, for example, tapes that would prove his innocence.

> But he's had [a] fundamental understanding of the charges against him, of his attorneys, of the process, of the judges, of the – what would happen in court, of his right to appeal, that – you know, he had told me even back in 1999 that after his automatic appeals that he didn't want to pursue any post-conviction appeal. But, of course, that thinking can change over time, and the Court's concerned with the relevant window, and he did not speak to me about that in that relevant window.

> . . .

> I'm trying to convey that he had a detailed and rational understanding of what was going on in court in terms of his legal rights and liabilities . . . He had some distorted beliefs about what his attorneys were attempting to do to him, what scientific technology was attempting to do to him; that distorted his perceptions of other things, particularly his ability to be rational going forward in his appeals, which is why I found him incompetent under [the Rees standard].

> . . .

> [T]he problem with Nix that I haven't addressed in my testimony here is the – his capacity to manage his personal affairs during that relevant time window. And, again, with the limitations I've already explained, not having seen him during that time, and it may have been different, but minimally I expect, because he has always been very concerned with his physical appearance, his physical fitness, his diet, he's been able to maintain himself, be well groomed. Every time that I've seen him that's been a constant, so I

21

believe at that time he was able to manage his personal affairs, and that he did retain a substantial capacity to appreciate his legal rights and liabilities.

On cross-examination, Dr. Martell acknowledged that issues of competency are "present state" examinations, meaning they reflect how a person is functioning at the present time. Accordingly, Dr. Martell testified that his diagnosis of Reid could have changed since his August 2006 interview because Reid had since been prescribed antidepressants and had been moved from Brushy Mountain to Riverbend.

Dr. Martell also explained on cross-examination that the acute exacerbation of Reid's delusional disorder he noticed in August 2006 had grown to incorporate the attorneys, judges, prison officials and other inmates. According to Dr. Martell, Reid offered the following reasons for wanting to abandon any further legal relief: the abuse and torture he endured at the hands of "scientific technology," and his belief that his attorneys were only concerned about his sexual activities and encouraging him to escape. Reid believed the alleged recordings of his life made by "scientific technology" would reveal his innocence. Dr. Martell testified during cross-examination that Reid believed his trials were mock and that everyone was coached about what to say. Dr. Martell also testified that characteristics of Reid's speech during the August 2006 interview, such as being overly detailed, tangential, and mispronouncing or using words incorrectly, revealed signs of thought disorder. Dr. Martell stated that Reid was suffering as a result of his psychotic condition and needed to be treated.

Dr. William Bernet testified on behalf of the State as an expert in the field of forensic psychiatry. Dr. Bernet initially evaluated Reid in January 1999, and then again in September 1999 regarding his competency to stand trial in the Baskin-Robbins case. Dr. Bernet interviewed Reid again on two occasions in February 2007 for a competency evaluation under the Rees standard. Dr. Bernet also interviewed Reid in April 2008. Although Dr. Bernet did not interview Reid during the applicable statutory period from May 2005 to May 2006, he testified that he could render an expert opinion about Reid's competency under the Nix standard during that time because he believed Reid's basic mental condition, mental makeup and external situation remained the same. Dr. Bernet opined that Reid was competent under the Nix standard during the applicable one year statute of limitations. Dr. Bernet believed that if he had interviewed Reid during that time period Reid would have given similar answers to those he gave during the 2007 and 2008 interviews.

Dr. Bernet diagnosed Reid with adjustment disorder, expressive language disorder and malingering. Dr. Bernet commented on the brain damage Reid suffered on his left side which may have contributed to his language disorder. According to Dr. Bernet, Reid experienced difficulty using the correct words to express ideas and he frequently

22

mispronounced words. Dr. Bernet, however, did not think Reid created neologisms. Dr. Bernet also diagnosed Reid with antisocial personality disorder. Further, Reid had a hearing impairment and a history of closed head injuries. Dr. Bernet testified, though, that neither the hearing impairment nor head injuries related to the adjustment disorder or malingering. Reid also exhibited psychosocial stressors associated with incarceration and the prospect of the death penalty. Dr. Bernet testified that antisocial personality disorder is a very stable condition which tends to persist throughout a person's adult life. Dr. Bernet also testified that he believed Reid had been malingering mental illness since 1978, in part, because Reid told him, as well as other mental health professionals, that he made up a whole series of psychiatric conditions when he was incarcerated in Texas.

Regarding his malingering diagnosis, Dr. Bernet testified that in 1999 Reid told him that he fabricated his story that he had been under government surveillance. According to Dr. Bernet:

> He said [the story] started when he was in prison [in Texas], and that he looked a whole lot healthier and in better shape than all the other people in this psychiatric unit, and that somebody asked him, he said are you a plant; are you actually an F.B.I. person; and that kind of started the idea that he could be somebody else. And he's told me that it went from that to the idea that the government was tracking him in various ways.

> This blossomed after he was released from prison in 1990 and he was on the street. And in 1993 he started writing letters to the governor of Texas, to people in Washington, and he had a handout that he gave out to people he knew in the community. And he told me that his reason for doing this was to draw attention to himself, because he felt that when he was convicted of these armed robberies, which I think was in 1982 he was convicted of multiple armed robberies and was in prison from '82 to 1990, that he felt that those convictions were wrong, and that he should not have been convicted of that, and he wanted the convictions reversed.

> So he claimed that he was going to try to get the attention of the governor and of other people by having this kind of crazy story; and that his purpose in having this story was to get their attention, and once he got their attention he would then be able to prove that he was mentally ill at the time he had these convictions. In other words, his basic argument was that he had pled guilty in . . . 1982 to these armed robberies and that he should have been found insane then, and so he was presenting a picture of an insane person with the idea that they should go back and reverse those convictions.

23

Dr. Bernet also testified that support for his diagnosis of malingering came from the correspondence between Reid's incarcerations and the course of his psychiatric illness. According to Dr. Bernet, though Reid had been given psychological tests before his first arrest in 1977 when he was twenty years old, Reid had never been diagnosed with a significant psychiatric disorder until after that arrest. Dr. Bernet also noted that Reid exhibited no psychotic symptoms after his release from prison in 1980, but that his psychotic illness was resurrected after he was arrested in 1982. Following his release in 1990, according to Dr. Bernet, Reid was required to follow-up with a local community psychiatrist who reported no current symptoms of a mental disorder.

Dr. Bernet said he asked Reid why he had problems inside, but not outside, prison: "And he said well, it's obvious; I'm a free man, I'm on the street, I don't – I don't need to have mental problems at this point." According to Dr. Bernet, Reid wanted to change his life around after his release in 1990, which included attempting to get his convictions reversed. During that time Reid wrote letters to various individuals describing the government surveillance. Dr. Bernet testified though that Reid said his attempt to reverse his convictions "didn't fly" and "so that pretty much died out." After reviewing Reid's records from Volunteer State Community College in Nashville, including his grades and some of the actual papers Reid wrote, Dr. Bernet saw no indication of psychotic thinking. Dr. Bernet testified that Reid's story about government surveillance next appeared during his first interview after his arrest for the crimes in these cases.

Dr. Bernet testified that individuals who suffer from paranoid delusions usually keep them to themselves. Furthermore, he said those individuals who truly have bizarre delusions are very disturbed and usually have schizophrenia. Dr. Bernet also testified that a paranoid delusional person is typically argumentative, irritable and hostile. Dr. Bernet said Reid, however, was friendly, outgoing and affable. Because Reid's behavior was not in line with those general characteristics, Dr. Bernet testified that was just another indication Reid was malingering. Dr. Bernet reiterated, though, that the main considerations in support of his diagnosis of malingering were Reid's self-reporting of fabrication and the course of the illness, that is, that it only surfaced when Reid was in trouble.

Following his February 2007 evaluation, Dr. Bernet opined that Reid was either a nonpsychotic but prevaricating individual who sometimes pretended to be delusional, or Reid was a severely psychotic delusional individual who sometimes pretended to be free of delusions. Dr. Bernet acknowledged that if Reid was actually psychotic, however, Dr. Bernet would have been less likely to have deemed Reid competent. Dr. Bernet admitted that he did not totally rule out the possibility that Reid had a delusional disorder. Dr. Bernet stated there was some possibility that Reid was actually psychotic, but he believed instead it was a much greater possibility that Reid was malingering.

Dr. Bernet testified on cross-examination that his reported opinion in 2007 was that Reid was a pathological liar. Dr. Bernet stated that pathological lying, or pseudologia fantastica, was a well known syndrome and that Reid was a pseudologue, a person affected by the syndrome pseudologia fantastica. Dr. Bernet further stated, however, that because there may have been some confusion concerning the terms pseudological fantastica and pseudologue he believed his diagnosis that Reid was a malingerer was sufficient to convey his opinion about Reid's condition.

Dr. Bernet testified that Reid developed his belief in government surveillance as a defense mechanism to protect himself from accepting the harsh reality that he killed seven people. Dr. Bernet explained that defense mechanisms can range from normal to psychotic or delusional. Dr. Bernet acknowledged that his initial diagnosis of Reid in January 1999 was different. In January 1999, Dr. Bernet diagnosed Reid as having a delusional disorder which developed gradually between 1986 and 1993. At that time, Dr. Bernet was aware that Reid had claimed to have made up the stories about government surveillance. Dr. Bernet also testified that Reid was conscious about how other people perceived him but that sometimes he would attempt to appear insane. Following his evaluation of Reid in September 1999, Dr. Bernet, however, withdrew his diagnosis of delusional disorder and concluded that Reid was malingering. Dr. Bernet did believe, though, that Reid had some underlying suspiciousness and paranoia in terms of personality traits.

Dr. Bernet confirmed that the DSM-IV definition of malingering was the intentional production of false or grossly exaggerated physical or psychological symptoms motivated by external incentives such as avoiding criminal prosecution. Dr. Bernet testified that Reid engaged in frequent lying; at times the lying took the form of malingering and at other times it protected him from feeling bad about something else. In other words, according to Dr. Bernet, Reid's lying served both a conscious and an unconscious purpose. Dr. Bernet testified that if he did not think Reid was malingering then Reid's ideas about government surveillance would sound like true delusions. According to Dr. Bernet though, because of Reid's unconscious desire for the defense mechanism, it was more important to Reid to maintain the idea of government surveillance than to appear fully competent.

The trial court questioned Dr. Bernet about why, if Reid was willing to abandon his legal remedies and accept his sentences of death, he would maintain the fantasy of scientific technology instead of admitting he was malingering. Dr. Bernet responded:

Mr. Reid has a high opinion of himself, and he wants other people to have a high opinion of him, and part of that is that he wants himself and other people to not think about these horrible things that have happened. . . . [A]ll these horrible things that happened are really inconsistent with this other part

25

of Mr. Reid that wants to be intelligent and friendly and nice to people. And he has devised this defense mechanism to protect himself from thinking about all those horrible things; and the mental mechanism is if only we could find the surveillance tapes we would be able to prove that I never did these horrible things.

And it's not very sophisticated, it's not [a] very mature mental mechanism, but – and it comes under the general category of denial, meaning in his mind he's denying that these things happened. But some people do use it, and it starts – and I think in his mind it starts as an idea, a fantasy; the fantasy sort of makes him feel better. You know, the fantasy being the surveillance tracked me during all those months, if only we could find those tapes we could prove it; and then he starts telling it to people, and when he tells it to some people those people are real interested in it, and so it kind of gets reinforced. But I think it protects him from extremely painful thoughts. And so you might as well keep it up; in other words, if you have something that's protecting you from really, really painful thoughts you might as well keep that mental activity going.

The trial court then asked Dr. Bernet if, in accordance with the Nix standard, Reid could understand his legal rights and liabilities and choose not to pursue post-conviction relief while at the same time persist in the fabrication of the idea of the "scientific technology." Dr. Bernet replied:

[B]oth of those phonomanias [sic] serve exactly the same purpose. The reason for the fabrication is to protect him from all these horrible bad thoughts and feelings, but that's the very same reason he gives for not wanting to go back and having a new trial, because he doesn't want to resurrect up [sic] all these witnesses who said very bad things about him, his family members had to say things about him he didn't like.

The reason he doesn't want [to] have a new trial is because all – many people said many bad things about him. And so avoiding a new trial protects him from people saying bad things, and having this defense mechanism protects him from thinking of these very same bad things. So these two things aren't contradictory, they both serve exactly the same purpose, which is he doesn't want to rehash a very, very bad part of his life.

. . .

26

[H]e also says other things that are kind of rational. He says even if we went back it wouldn't change the outcome; we would have the same outcome. . . . [H]e was able to describe how even if we went back and had a new trial the end result would be the same.

And he said very rationally juries have spoken; three different juries have spoken. And he says – I think kind of eloquently he says I don't like what they said but I accept what they say. In other words, his belief is that it wouldn't matter, there's no point in going back, and the only – the disadvantage of going back is it would stir up all these very unpleasant thoughts, and – and so that's avoiding going back and having a new trial, protects him from that, and having this fantasy system protects him from the same thing.

Dr. Michael First, a psychiatrist and editor of the DSM-IV, testified as a rebuttal witness on behalf Reid. Dr. First testified that the DSM is a manual that lists all the mental disorders, and their corresponding symptoms, officially recognized by the American Psychiatric Association. Dr. First was initially contacted about this case in September 2007. Dr. First interviewed Reid in March 2008.

Dr. First diagnosed Reid as having a delusional disorder with persecutory and grandiose type. Dr. First stated, though, that he would not rule out the possibility that Reid's temporal lobe damage could be a causal factor. Dr. First, referring to the DSM-IV definition, testified that a delusion is a false belief based on an incorrect inference about external reality that is firmly sustained despite what almost everyone else believes and despite what constitutes incontrovertible and obvious proof or evidence to the contrary. Dr. First found support in his diagnosis of delusional disorder when Reid insisted that the two of them had met four times prior, even though they had not, and because Reid believed Dr. First was being coached by "scientific technology."

Dr. First disagreed with Dr. Bernet's diagnosis of malingering. According to Dr. First, Dr. Bernet opined that one of the benefits Reid gained from creating his delusional beliefs was psychological, i.e., it may him feel better by forgetting the crimes he committed. Dr. First explained, however, that the definition of malingering refers to external gains, such as avoiding prosecution, rather than internal gains, such as feeling better. Furthermore, Dr. First stated that Dr. Bernet focused only on one aspect of Reid's complex delusions, the surveillance tapes which could allegedly prove his innocence, but ignored the other instances of "scientific technology's" purported influence which Reid described such as mind control and the infliction of pain.

27

Dr. First disagreed with Dr. Bernet's testimony regarding the absence of evidence of delusions when Reid was not incarcerated prior to 1997. Dr. First commented on the letters about "scientific technology" Reid wrote to various individuals during that time as well as the accusations Reid made about his girlfriend being coached by "scientific technology." Referring to the DSM, Dr. First testified an individual's personality remains constant when that person suffers from a delusional disorder. Dr. First, therefore, disagreed with Dr. Bernet's opinion that Reid did not display the characteristic of a delusional person because he was typically friendly and outgoing. He further testified, though, that an individual could become agitated if they are challenged about their delusional beliefs.

Dr. First stated that Reid denied being mentally ill. Reid told people about the government surveillance and "scientific technology," but according to Dr. First, when questioned by mental health professionals, Reid would have said he made the stories up in order to appear sane. According to Dr. First, Reid had no insight into his mental illness. Dr. First explained that Reid knew his stories about "scientific technology" appeared crazy, but he did not know they were actually crazy. Accordingly, as Dr. First testified, Reid was shrewd enough to say that he fabricated the stories to appear normal. Dr. First testified that the intensity of Reid's delusions could wax and wane over time. Based upon his review of Ms. Westfall's notes during the statutory period of limitations, he opined that Reid's delusions were quite intense during that year.

## POST-CONVICTION PROCEDURE ACT

In order to obtain relief under the provisions of the Post-Conviction Procedure Act, an inmate of this state must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. See Tenn. Code Ann. § 40-30-103. The Act imposes a one year statute of limitations for pursuing post-conviction relief. See Tenn. Code Ann. § 40-30-102(a). Accordingly, a petition for relief must be filed within one year of the date of the final action of the highest state appellate court to which an appeal is taken or, if no appeal is taken, within one year of the date on which the judgment became final, or consideration of the petition shall be barred. Id. The Act requires that a petitioner "verify under oath" all known claims for relief and the allegations of fact supporting those claims. Tenn. Code Ann. § 40-30-104(d) and (e); see Holton and Reid, 201 S.W.3d at 630-31.

In two earlier appeals in the Captain D's and Baskin-Robbins cases, our supreme court outlined the manner in which a "next friend" may pursue post-conviction relief on behalf of a petitioner who is alleged to be incompetent. Reid, 197 S.W.3d 694; Holton and Reid, 201 S.W.3d 626. The civil standard of mental competency, adopted by the court in State v. Nix, 40 S.W.3d 459 (Tenn. 2001), applies to the determination of whether a petitioner is competent to pursue a post-conviction action. Reid, 197 S.W.3d at 702. That is, a petitioner

must be able "either to manage his personal affairs or to understand his legal rights and liabilities." Id. A petitioner, usually with the assistance of counsel or a "next friend," must make a threshold showing that he is incompetent to proceed. Id. at 703. A qualified "next friend" is someone who is acting in the best interests of the petitioner. Reid, 201 S.W.3d at 635.

If a prima facie showing of incompetence is made, the trial court will then conduct a full competency hearing. Id. At that hearing, the petitioner bears the burden of proving his incompetence by clear and convincing evidence. Id. at 705. If the trial court concludes that the petitioner is competent, only a petition for post-conviction relief personally endorsed by the petitioner will be permitted to be filed. If, however, the trial court determines that the petitioner is incompetent, the court shall permit a "next friend," or guardian at litem, to move forward with any post-conviction claims on the petitioner's behalf. Id. at 706. The supreme court held there is no reason for the trial court to stay further proceedings pending a petitioner's return to competency. Id.

Reid was able to meet the threshold showing in all three of these cases. Therefore, there is no issue concerning Martiniano's "next friend" status. Again, the Davidson and Montgomery County trial courts determined that Reid was competent. Accordingly, the petitions filed by the "next friend" in the McDonald's and Baskin-Robbins cases and the unsigned amendment filed by counsel in the Captain D's case were dismissed.

## STANDARDS OF COMPETENCY

In order to aid our analysis of the issues on appeal, the following summary recites the various standards of competence applicable in criminal cases in Tennessee. As our supreme court recognized in one of the previous appeals involving Reid, the "spectrum of the criminal process" encompasses different constitutional rights entailing distinct degrees of competence. Reid, 197 S.W.3d at 699-702. We are reminded, however, that "mental illness is not the equivalent of mental incompetence." State v. Nix, 40 S.W.3d 459, 463 (Tenn. 2001).

To be considered competent to stand trial, a criminal defendant must have "'the capacity to understand the nature and object of the proceedings against him, to consult with counsel and to assist in preparing his defense.'" State v. Black, 815 S.W.2d 166, 174 (Tenn. 1991) (quoting Mackey v. State, 537 S.W.2d 704, 707 (Tenn. Crim. App. 1975)). To be considered competent to proceed in a post-conviction action, a petitioner must be able "either to manage his personal affairs or to understand his legal rights and liabilities." Reid v. State, 197 S.W.3d 694, 702 (Tenn. 2006) (adopting the competency standard applied in civil cases in Tennessee). Because Reid raises an issue regarding the applicable standard of competency

for pursuing post-conviction relief, we will discuss this standard in greater detail during our analysis of the issues in the next section.

To be considered competent in capital cases to withdraw an already-filed post-conviction petition and waive further relief, the issue for the court is "whether the petitioner possesses the present capacity to appreciate the petitioner's position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether the petitioner is suffering from a mental disease, disorder, or other defect which may substantially affect the petitioner's capacity." Tenn. Sup. Ct. R. 28, Sec. 11(B)(1). This is the same standard utilized by the federal courts to determine whether a prisoner is competent to terminate a collateral attack of his or her conviction or sentence. See Rees v. Peyton, 384 U.S. 312 (1966). Finally, "the test for competence to be executed requires a prisoner to have 'a rational understanding of his conviction, his impending execution, and the relationship between the two.'" State v. Irick, 320 S.W.3d 284, 295 (Tenn. 2010). "[E]xecution is not forbidden so long as the evidence shows that the prisoner does not question the reality of the crime or the reality of his punishment by the State for the crime committed." Id.

## ISSUES

Reid raises a number of challenges to the actions and decisions of the two trial courts. We have decided to address together those issues which are common to all three cases, while those issues which only challenge the Davidson County proceedings are highlighted below.

### Applicable Standard of Competency and Burden of Proof

In all three cases, Reid challenges the standard the Davidson and Montgomery County trial courts utilized to determine whether Reid was competent during the applicable time frames as well as the burden those courts required Reid to satisfy in order to prove he was incompetent. The trial courts applied the standard of competency originally adopted by the supreme court in Nix and required Reid to prove by clear and convincing evidence that he was incompetent to proceed. Reid argues, however, that the trial courts did not consider whether he had a *rational* understanding of his legal rights and liabilities. Reid contends that the lack of a rationality requirement in the Nix standard violates his due process rights. Reid also argues that requiring him to prove his incompetency by clear and convincing evidence also offends due process.

Reid's challenges to the applicable standard of competency and burden of proof must fail. As the State observes, these questions have already been answered by our supreme court in earlier opinions involving Reid's cases. In Reid and Holton and Reid v. State, the court set forth the procedure trial courts must follow in the post-conviction setting when deciding

if a petitioner is incompetent to proceed and whether he or she may be allowed to have his or her interests pursued by a "next friend." 197 S.W.3d 694; 201 S.W.3d 626. This Court recognizes the slight procedural difference when an incompetent petitioner signs a timely filed petition and when a "next friend" files a petition on behalf of an incompetent inmate. See Holton and Reid, 201 S.W.3d at 629. In either situation, though, the same standard and burden of proof apply at the evidentiary hearing.

The supreme court held that the standard adopted in Nix applies to the determination of a petitioner's competence in the post-conviction context. Reid, 197 S.W.3d at 702. The Nix standard provides that a petitioner is incompetent only if he or she is "unable either to manage his [or her] personal affairs or to understand his [or her] legal rights and liabilities." Id. at 702. In arriving at this holding, the supreme court recognized that post-conviction procedures are not constitutionally required. Id. at 700 (citing Pike v. State, 164 S.W.3d 257, 262 (Tenn. 2005)). See also Holton and Reid, 201 S.W.3d at 630 ("post-conviction review is not *required* by constitutional or statutory principles, even in capital cases") (emphasis in original). The court thus observed that many of the constitutional rights applicable at trial, such as the right to counsel, no longer attach in the post-conviction setting. Reid, 197 S.W.3d at 700. The court stated, though, that "[d]ue process concerns may nevertheless be implicated in the post-conviction context where a potential litigant is denied an opportunity for the presentation of claims at a meaningful time and in a meaningful manner." Id. (citing Burford v. State, 845 S.W.2d 204, 208 (Tenn. 1992)).

The supreme court acknowledged Reid's assertion that the appropriate standard of competence "should be whether a petitioner is able to consult with counsel with a *reasonable degree of rational understanding*." Id. at 701 (emphasis added). The court stated, however, that "[i]n arguing for a level of competency commensurate with that required for trial, Reid misconstrues the nature of the right. . . . competency to proceed on post-conviction is neither a constitutional nor a statutory right." Id. at 702. The court reasoned:

> Due process requires only that a petitioner be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner. The civil standard of competence is sufficient to meet that requirement. At trial, a defendant must make fundamental decisions that require the advice of counsel but are ultimately personal to the defendant. See, e.g., Momon v. State, 18 S.W.3d 152 (Tenn. 1999) (waiver of right to testify). Thus, the necessity for *rational* consultation is apparent. On post-conviction, the decision-making authority shifts to counsel. See Leslie v. State, 36 S.W.3d 34, 38 (Tenn. 2000). Although counsel is required to interview the petitioner and to consult with him "where feasible," counsel "retains the right to make strategic and tactical decisions – including the determination of which issues

31

are reasonable and should be raised and pursued – based on counsel's professional judgment." Id. Through the assistance of counsel, who have access to the appellate record and trial counsel's files and who operate under an affirmative mandate from this Court to investigate and present all "reasonable claims," Tenn. Sup. Ct. R. 28, § 6(C)(2), a petitioner is afforded the opportunity for the presentation of claims in a meaningful manner.

Under the civil standard of competence, a petitioner must understand his legal rights and liabilities. Implicit in our holding in Nix is the determination that this level of competency sufficiently provides a petitioner with the opportunity to challenge his or her conviction in a meaningful manner. Due process considerations do not mandate different levels of competency at different stages of post-conviction proceedings. A level of competency sufficient to commence a post-conviction action is sufficient to pursue the matter to conclusion.

Id. (emphasis added). As the supreme court had previously emphasized, "[d]ue process is flexible and calls for such procedural protections as the particular situation demands." Nix, 40 S.W.3d at 463 (quoting Seals v. State, 23 S.W.3d 272, 277 (Tenn. 2000)).

The supreme court specifically declined a request to adopt the competency standard announced in Rees and embodied in Supreme Court Rule 28: "whether petitioner possesses the present capacity to appreciate the petitioner's position and make a *rational* choice with respect to continuing or abandoning further litigation or on the other hand whether the petitioner is suffering from a mental disease, disorder, or other defect which may substantially affect the petitioner's capacity." Tenn. Sup. Ct. R. 28, Sec. 11(B)(1) (emphasis added). See Rees v. Peyton, 384 U.S. 312, 314 (1966). The court stated that the Rees standard, which contains a "rationality" component, "is limited . . . to the unique circumstances involved when a petitioner in a capital case seeks to withdraw an already-filed post-conviction petition and waive further post-conviction relief." Id. at 701 n. 7.

The supreme court's reasons for adopting the Nix standard of competency squarely address Reid's argument on appeal in these cases. The supreme court was aware of the differences between the Nix standard and the Rees standard. The court, however, directly rebuffed Reid's assertion that the competency standard for pursuing post-conviction relief should include a "rationality" component. The supreme court concluded that Reid's due process concerns were not implicated by the adoption of the Nix standard. Explicit in that conclusion is the maxim that an individual has no fundamental right to collaterally attack a criminal conviction. See Reid, 197 S.W.3d at 700; Nix, 40 S.W.3d at 463. Although the trial courts and Reid may be "perplexed" by the supreme court's adoption of different standards

of competence in the post-conviction arena, it is clear to this Court that the standard of competence adopted by the supreme court in Nix applies to the ultimate question in the cases at hand. And despite Reid's disagreement with the supreme court's reasoning, we are bound by the decisions of our supreme court. See State v. Jefferson, 938 S.W.2d 1, 21 (Tenn. Crim. App. 1996).

The trial courts correctly applied the standard of competency adopted by the supreme court in Nix and reaffirmed in Reid, that is, whether Reid was able either to manage his personal affairs or understand his legal rights and liabilities. See 197 S.W.3d at 702. Reid's argument on this issue is without merit. This Court will review later in the opinion the trial courts' rulings on the issue of competency.

Our supreme court further held in Reid that a petitioner bears the burden of proving by clear and convincing evidence that he or she is incompetent. 197 S.W.3d at 705. Citing the burden of proof contained in the Post-Conviction Procedure Act, Tennessee Code Annotated Section 40-30-110(f), the court stated there was no justification for a departure from that clear and convincing standard for purposes of a hearing to determine competence to proceed in a post-conviction action. Reid, 197 S.W.3d at 703. The court specifically rejected Reid's arguments that neither party should bear the burden of proof, or that, if a petitioner bears the burden of proof, it should only be by a preponderance of the evidence. Id. at 703-04. The court noted that the lesser preponderance of the evidence standard only applies when constitutional rights are concerned. Id. at 704. The court concluded:

> The issue of the constitutional right of a mentally retarded individual not to be executed is the same whether it is raised at trial or on post-conviction. Accordingly, the burden of proof should not differ depending upon whether the defendant makes his claim of retardation at trial or on post-conviction. Reid's claim of incompetency to proceed with his post-conviction proceeding is not analogous to [a] claim of retardation because there is no constitutional right to competency during post-conviction proceedings. Similarly, the issue of competency to stand trial is separate and distinct from the issue of competency to proceed in a post-conviction action. Therefore, any disparity between the burden placed on defendants with respect to their competency to be tried and/or executed and the burden placed on petitioners alleging incompetency to proceed with a post-conviction action does not raise due process concerns.

> We are guided by our treatment of the burden of proof in the closely analogous tolling context. For a petitioner alleging that the post-conviction statute of limitations should be tolled, the consequences of an erroneous

33

determination of competence are significant in that the petitioner will be precluded from presenting his or her claims. Nevertheless, we have concluded that the clear and convincing standard is appropriate in this context. See Nix, 40 S.W.3d at 464. After the timely filing of a post-conviction petition, the consequences of an erroneous determination of competence are comparatively less significant because, while the manner of the presentation of the claims may be affected, the claims themselves are not precluded. If the clear and convincing standard is adequate to ensure due process in the tolling context, then we deem it proper for purposes of the post-conviction proceeding itself. Consistent with Nix, we therefore conclude that at a competency hearing a petitioner bears the burden of proving by clear and convincing evidence that he or she is incompetent to proceed in a post-conviction action.

Id. at 704-05.

Again, as noted above, this Court is bound by the decisions of our supreme court. See Jefferson, 938 S.W.2d at 21. The burden of proof required of a petitioner at a hearing to determine whether the petitioner is incompetent to proceed in a post-conviction action has been established by the supreme court. This Court cannot require any different standard. Nor can this Court require that the burden of proof shift to the State in these cases. Reid's argument, that "[i]t flies in the face of logic, fairness, and due process to require him to prove by clear and convincing evidence what has already been proven and established" in other proceedings, is unpersuasive. Reid has not been declared incompetent by any court under the Nix standard. We address below Reid's argument regarding the relevance of his collateral proceedings in federal court. The trial courts applied the correct burden of proof at the competency hearings in these cases. Reid's argument on this issue is without merit.

**Preclusion Doctrines**

Reid next argues that the State should be precluded from contesting his competence in the instant state post-conviction proceedings given its actions in separate federal court proceedings. Reid relies upon the doctrines of res judicata, collateral estoppel and judicial estoppel in support of his argument. According to Reid, the State has previously conceded Reid's incompetence in federal court. Reid alludes to a federal habeas corpus action in the Baskin-Robbins case, the petition for a writ of certiorari to the United States Supreme Court filed in the direct appeal of the McDonald's case, and a federal civil rights action challenging the constitutionality of Tennessee's lethal injection protocol. In the habeas corpus and civil rights actions, the State agreed that Reid's sisters could proceed as "next friends" on Reid's behalf because they satisfied the threshold showing of incompetence under the applicable Rees standard. Reid contends that by not contesting the participation of his sisters in those

34

cases the State cannot now challenge his competency in these state court proceedings. In addition, Reid argues that certain unopposed statements made by his attorney in a motion accompanying the petition for writ of certiorari filed in the McDonald's case, which referenced Reid's sister serving as his "next friend" in the federal habeas corpus case, serve as a similar concession by the State.

Our supreme court has summarized the related doctrines of res judicata and collateral estoppel as follows:

> Res judicata bars a second suit between the same parties and their privies on the same cause of action as to all issues which were or could have been litigated in the former suit. Collateral estoppel operates to bar a second suit between the same parties and their privies on a different cause of action only as to issues which were actually litigated and determined in the former suit. To support a plea of res judicata, it must be shown that the judgment in the prior case was final and concluded the rights of the party against whom it is asserted. It is also necessary to show that both cases involved the same cause of action. To sustain a plea of collateral estoppel it must be shown, inter alia, that the issue sought to be concluded not only was litigated in the prior suit but was necessary to the judgment in that suit.

Massengill v. Scott, 738 S.W.2d 629, 632 (Tenn. 1987). Regarding the doctrine of judicial estoppel, the supreme court recently clarified that the doctrine is "applicable only when a party has attempted to contradict by oath a sworn statement previously made." Cracker Barrel Old Country Store, Inc. v. Epperson, 284 S.W.3d 303, 315 (Tenn. 2009) (emphasis in original).

We agree with the State that Reid cannot satisfy the requirements of any of these preclusion doctrines. Res judicata does not apply because the causes of action are clearly not the same. A state post-conviction action is unique compared to a federal habeas corpus action, a federal civil rights action and a request for review by the Supreme Court in a direct appeal of a criminal conviction and sentence. Cf. Tenn. Code Ann. §§ 40-30-101 et seq. with 28 U.S.C. § 2254 and 42 U.S.C. § 1983 and Sup. Ct. R. 10.

Nor does collateral estoppel apply. Reid commonly refers to the "issue" of his competency in his briefs before this Court. Although the ultimate question to be decided in these cases is whether Reid is competent, the *legal* issues in the state post-conviction cases and the federal court actions are different. We have discussed above the several standards of competence established by our supreme court which are to be applied in the various stages of criminal cases, including post-conviction matters. Furthermore, we have acknowledged

35

that the competency standard for purposes of proceeding in a state post-conviction action is clearly different than the standard applied in a federal habeas corpus action. The question before us is whether Reid is able to manage his personal affairs or understand his legal rights and liabilities. Reid, 197 S.W.3d at 702. The standard employed by the federal courts in the actions cited by Reid is whether he has the capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or whether he suffers from a mental disease, disorder, or other defect which may substantially affect his capacity. Rees, 384 U.S. at 314. The doctrine of collateral estoppel requires that the issue to be precluded in the present case is identical, not merely similar, to the issue decided in the earlier action. Beaty v. McGraw, 15 S.W.3d 819, 827 (Tenn. Ct. App. 1998). Moreover, the applicable legal standards involved must also be identical. Id. "Different legal standards as applied to the same set of facts create different issues." Id. (citation omitted). Because the competency standard employed by the federal courts is clearly different than the standard applied in the instant state post-conviction cases, Reid's reliance on collateral estoppel is misplaced.

Finally, judicial estoppel offers Reid no relief either. The State has not attempted to contradict, *by oath*, a sworn statement it previously made. In Cracker Barrel, the supreme court distinguished the doctrine of judicial estoppel from the doctrine of equitable estoppel. Equitable estoppel applies "[i]n those instances where no oath is involved but the party is attempting to gain an unfair advantage by maintaining inconsistent legal positions." Id. In order for equitable estoppel to apply, a party must engage in conduct which amounts to a false representation or concealment of material facts. Id. Reid, however, is not asserting the doctrine of equitable estoppel. Nevertheless, because he does not contend that the State falsely represented or concealed material facts, that doctrine is not applicable.

This issue is without merit.

### Testimony of Dr. William Bernet
### (Davidson County cases)

Dr. William Bernet was accepted by the trial judges in both the Davidson and Montgomery County hearings, without objection, as an expert in the field of forensic psychiatry. Dr. Bernet's testimony at those hearings is summarized above. Reid now argues, however, that Dr. Bernet's testimony and report should be stricken from the record in the Davidson County cases (Captain D's and McDonald's). Reid does not advance this argument in the Montgomery County case (Baskin-Robbins).

Dr. Bernet testified in the Captain D's case in the 2007 hearings regarding Reid's competency to withdraw the pro se petition he filed in that case. Reid objected to Dr.

Bernet's testimony at that time, but the trial court denied the objection and considered Dr. Bernet's testimony and report in arriving at its conclusion that Reid was incompetent to withdraw his petition under the applicable Rees standard. During the hearings in 2007, Dr. Bernet testified that Reid suffered from pseudologia fantastica, or pathological lying. Dr. Bernet conceded that pathological lying was not a recognized diagnosis under the DSM-IV, but stated that the term appeared elsewhere in the manual. Dr. Bernet further indicated that pathological lying was an accepted term in the profession. Dr. Bernet explained that pathological liars could become so engrossed in their lies that the person would adopt the lies as reality.

Prior to the joint 2008 competency hearing in the instant cases, Reid again objected to the admission of any testimony by Dr. Bernet that Reid suffered from the syndrome called pseudological fantastica, or pathological lying. Reid based his objection on Tennessee Rules of Evidence 403, 702 and 703, as well as several constitutional grounds. According to Reid's argument, Dr. Bernet's opinions regarding pathological lying lacked sufficient indicia of scientific reliability to be trustworthy within the meaning of Rule 703, and that, accordingly, Dr. Bernet's testimony would not substantially assist the trial court in rendering a decision on Reid's competence. Reid also argued that the testimony was inadmissible because any relevance it had was substantially outweighed by the danger of unfair prejudice and confusion of the issues.

Prior to the evidentiary hearing, the trial court, while acknowledging the fact that Reid had filed his written objection to Dr. Bernet's testimony, stated: "We'll get to that when we get to it." Dr. Bernet was called as a witness by the State, without any objection at that time by Reid, and was allowed to testify as an expert in the field of forensic psychiatry. Reid did not renew his objection when Dr. Bernet was called to the stand, but instead Reid cross-examined Dr. Bernet about his earlier diagnosis of pathological lying. When Reid questioned Dr. Bernet about whether he was abandoning the diagnosis he rendered in the 2007 hearings, Dr. Bernet explained:

> I thought last year that the concept of pathological lying was a helpful concept to explain Mr. Reid's condition. I thought it would be helpful to the Court and to everybody else. As it turned out, that concept created confusion. It created a huge amount of confusion over what it meant and how meaningful it was. And the use of that term basically turned out to be a diversion away from the fundamental issues in this case. So I just found that it's not helpful to use that term since that term stirs up a whole lot of unnecessary discussion. So I don't need that term. I think it's perfectly okay just to say that Mr. Reid conducts or does repetitive lying or persistent lying. I don't think we need to use the term pathological lying since that term seems to upset people.

37

Reid then proceeded to cross-examine Dr. Bernet without any further mention of the term pathological lying, other than Dr. Bernet's cursory statements explaining that pseudological fantastica is not the same thing as malingering and that a person could possibly suffer from both pseudological fantastica and delusional disorder. There is nothing in the record reflecting that the trial court actually ruled on Reid's written objection filed prior to the hearing. In its final order, the trial court summarized Dr. Bernet's reports and testimony from both the 2007 and 2008 hearings and the court relied upon Dr. Bernet's evaluation in arriving at its conclusion.

On appeal, Reid renews his objection to Dr. Bernet's testimony. Reid argues that the trial court erred in allowing Dr. Bernet to testify because of his earlier diagnosis of pathological lying. Reid suggests that Dr. Bernet's opinion lacked sufficient indicia of scientific reliability to be trustworthy within the meaning of Rule 703. Reid contends, therefore, that Dr. Bernet's testimony did not substantially assist the trial court within the meaning of Rule 702 in making its competency determination. According to Reid's argument, Dr. Bernet's reasoning or methodology failed to satisfy the requirements of McDaniel v. CSX Transportation, Inc., 955 S.W.2d 257 (Tenn. 1997) and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

The record does not support Reid's argument on this issue. Although Dr. Bernet's report and testimony in the 2007 hearing to determine whether Reid was competent to withdraw his pro se petition in the Captain D's case concluded that Reid suffered from pseudological fantastica, Dr. Bernet subsequently abandoned any reference to that term. Dr. Bernet specifically testified in the 2008 hearing that the term pathological lying was not necessary to his opinion that Reid's ideas about government surveillance and scientific technology were fabrications. The trial court's orders in the two Davidson County cases recognize the same. In arriving at his opinion that Reid was competent under the Nix standard, Dr. Bernet did not rely upon a diagnosis of pseudological fantastica, or pathological lying. Interestingly, Dr. Bernet also testified in the Montgomery County case about his previous diagnosis of pathological lying but stated that he no longer needed to use that term because he believed his diagnosis that Reid was a malingerer was sufficient for him to convey an opinion about Reid's mental state. Reid, however, does not object to Dr. Bernet's testimony in that hearing.

Nevertheless, as noted by the State, Reid did not voice a contemporaneous objection during the 2008 hearing. The trial court clearly deferred ruling on Reid's pre-hearing written motion. Not only did Reid fail to renew his objection when Dr. Bernet was called to the stand, he engaged in an extensive cross-examination of Dr. Bernet about his opinion of Reid. As quoted above, Dr. Bernet testified that he abandoned his diagnosis of pseudological fantastica. Given Reid's actions during the hearing, and the fact Dr. Bernet did not testify

38

that Reid suffered from pseudological fantastica, it is apparent the trial court considered Reid's objection moot.  We conclude that Reid's failure to renew his objection when Dr. Bernet testified results in the waiver of the issue on appeal.  <u>See</u> <u>State v. Charles O. Emesibe</u>, No. M2003-02983-CCA-R3-CD, 2005 WL 711898 (Tenn. Crim. App., Mar. 28, 2005), <u>perm. to app. denied</u>, (Tenn., Oct. 17, 2005) (a motion in limine does not preserve an issue for appeal if the motion is deferred and waiver may occur if the objection is not renewed prior to the introduction of the challenged evidence); <u>see</u> <u>also</u> Tenn. R. App. P. 36(a). Counsel's alternative argument on appeal concerning Dr. Bernet's diagnosis of malingering in the Captain D's case must also be considered waived.  Counsel did not voice an objection in the trial court to that aspect of Dr. Bernet's testimony.  The Court will address below any challenges to the credibility of Dr. Bernet's opinion that Reid was a malingerer.

This issue is without merit.

### Evaluations of Drs. Bernet and Martell
### (Davidson County cases)

Prior to the joint competency hearing in Davidson County, counsel for Reid filed a written motion on April 30, 2008, to strike from evidence the reports and anticipated testimony of Drs. Bernet and Martell because the State did not provide counsel prior notice of the scheduled interviews by Drs. Bernet and Martell.  Dr. Bernet interviewed Reid on April 11, 2008, and Dr. Martell interviewed Reid on April 22, 2008.  The competency hearing was held on May 12 and 13, 2008.  Following a hearing on May 5, 2008, the trial court denied the motion to strike.

On appeal, Reid argues that the trial court erred in denying the motion to strike.  In support of his argument, Reid states that his attorneys were unable to meet the State's experts at the prison, re-introduce Reid to the experts, and assess whether the conditions of the interviews were acceptable.  Reid, however, does not explain how he or his attorneys were prejudiced by the lack of prior notice of the interviews.  Reid cites to the general prohibition of communication with a person a lawyer knows is represented by another lawyer unless consent is given by the other lawyer or the lawyer is authorized to do so by law.  <u>See</u> Tenn. Sup. Ct. R. 8 (Rule 4.2 of the Rules of Professional Conduct).  Reid contends that a violation of Rule 4.2 requires exclusion of the evidence.  As the State observes, however, Reid does not argue that the State was not entitled to conduct a mental health evaluation or that Drs. Bernet and Martell obtained information in the course of the interviews that they would not otherwise have gained.

As the trial court stated, because Reid raised the issue of his competency, the State was entitled to examine him before the hearing, and Reid's "ability to curtail or limit the

evaluation process [had, therefore,] been essentially extinguished." The trial court correctly recognized that the State's right to conduct examinations in this case is undisputed. See Tenn. Code Ann. § 33-7-301(a)(2). The trial court recognized further that a petitioner has no right to the presence of counsel at a court ordered mental health evaluation. See State v. Huskey, 964 S.W.2d 892, 897 (Tenn. 1998) (citing State v. Martin, 950 S.W.2d 20 (Tenn. 1997)). Although the trial court acknowledged that the State should have provided prior notice of the interviews to counsel for Reid, the court noted that neither the consent of counsel nor Reid would otherwise have been required had notice been given.

Reid's argument that a violation of Rule 4.2 requires automatic exclusion of the evidence in this case is without merit. As this Court has previously held, "[a] violation of the disciplinary rules . . . is not necessarily a valid basis for suppression of evidence." State v. Baker, 931 S.W.2d 232, 237 (Tenn. Crim. App. 1996). In Baker, this Court relied upon its earlier opinion in State v. Mosher, 755 S.W.2d 464 (Tenn. Crim. App. 1988), a case which also dealt with an issue about communications between the prosecution and the defendant without the knowledge and consent of defense counsel. The Court recognized that the prohibition against communications absent the consent of adverse counsel has been found to apply in criminal cases. Baker, 931 S.W.2d at 237 (citing Mosher). In neither case, however, did this Court require suppression of the evidence obtained in violation of this rule of conduct. We decline to stray from the rulings in Baker or Mosher.

Moreover, Reid's reliance on the holding in Estelle v. Smith, 451 U.S. 454 (1981), is misplaced. In Estelle, the United States Supreme Court was asked to decide whether the prosecution's use of psychiatric testimony at the sentencing phase of the defendant's capital murder trial to establish the defendant's future dangerousness violated his constitutional rights. Id. at 456. The defendant in Estelle did not raise an issue regarding his mental health. The trial court, however, in accordance with its general practice in capital cases, ordered a psychiatric evaluation to determine whether the defendant was competent to stand trial. Id. at 457. The prosecutor subsequently called as a witness to testify during the penalty phase of the trial the psychiatrist who evaluated the defendant prior to trial. Id. at 458. The defendant challenged the testimony of that witness on the basis that his Fifth and Sixth Amendment rights were violated because he was not advised of his right to remain silent during the pretrial evaluation and because he was denied assistance of counsel to decide whether or not to submit to the pretrial evaluation when his statements made therein could have later been used in the penalty phase of his trial. The Supreme Court agreed. Id. at 473. In arriving at its decision, however, the Court specifically distinguished the factual scenario in Estelle from the case wherein a defendant raises the issue of his mental health. Id. at 465-66 and 472. The Court stated that a defendant can be required to submit to a mental health evaluation conducted by the state's expert if he intends to introduce his own evidence on the subject. Id. Accordingly, we conclude that the holding in Estelle does not control our

40

decision in this case because, as discussed above, Reid has placed the question of his mental status squarely in the center of these cases.

Having reviewed the record with respect to this issue, this Court detects no resulting prejudice to Reid. Both experts had interviewed Reid before, and there is no suggestion by Reid that the conduct of the experts during their respective interviews was inappropriate in any way. Furthermore, during a status hearing on February 5, 2008, the State mentioned that it might rely on the expertise of Drs. Bernet and Martell. In fact, when the State expressed its assumption during that hearing that Reid's attorneys would not object to the State being able to evaluate Reid, Reid's attorneys voiced no objection or made no other comment about the State's announcement.

This Court agrees with the trial court that there is no basis upon which to exclude either the reports or testimony of Drs. Bernet and Martell. This issue is without merit. Counsel also argue that exclusion is necessary because they were "effectively precluded from obtaining their own mental health interviews and current evaluations of Mr. Reid in the same time frame in which the State obtained their evaluations." We address this argument in our discussion of the issue relating to funding for expert services.

### Funding for Expert Witnesses
### (Davidson County cases)

Reid argues that the trial court violated his due process rights by refusing to authorize additional funding for further evaluations prior to the evidentiary hearing. The joint hearing occurred in Davidson County on May 12-13, 2008. On March 6, 2008, Reid filed an *ex parte* motion for additional funding for expert services. Reid sought to have Dr. George Woods, Dr. Xavier Amador, Dr. Ruben Gur and Dr. Michael First provide additional assistance in this case. Reid wanted Drs. Woods, Gur, and Amador to reevaluate him, review any reports or tests generated by the State's experts, consult with counsel, and testify at the competency hearing. Additionally, Reid wanted to call Dr. First as a rebuttal witness regarding Dr. Bernet's use of the pseudologia fantastica terminology. Reid renewed his requests in April 2008, and again in May 2008, just before the competency hearing.

Dr. Amador evaluated Reid in the past prior to the trial in the McDonald's case. Drs. Woods and Gur each evaluated Reid numerous times in the past in connection with these cases, their most recent interviews having taken place in December 2007. In fact, Reid relied upon the affidavits of Drs. Woods and Gur to satisfy the threshold showing of his incompetence in these cases. Furthermore, Reid indicated to the trial court and the State during a status conference in February 2008 that Drs. Woods and Gur would serve as his expert proof at the evidentiary hearing.

In the motion filed on March 6, 2008, Reid requested funding for an additional thirty hours of services for Dr. Woods, an additional twenty hours of services for Drs. Gur and Amador, and twenty hours of services for Dr. First. Following an *ex parte* hearing on the motion, the trial court approved funding for ten hours of work for Dr. Woods and seven hours of work for Dr. Gur. The court also approved travel expenses for each expert. The court denied any additional funding for Dr. Amador. The court also denied funding for Dr. First, but stated it was willing to reconsider a request for funding for Dr. First at a later date.

In its order on the March 6th motion, the trial court concluded that the opinions Drs. Woods and Gur each held about Reid were not going to change. The trial court noted that Dr. Woods had never wavered on his opinion about Reid's mental state. The court thus found unpersuasive Reid's argument that an additional evaluation by Dr. Woods was necessary because an individual's competence can wax and wane. Observing that Dr. Woods had repeatedly opined that Reid was incompetent under both the Nix and Rees standards, the trial court stated: "[Reid] is not then entitled to show he is more severely incompetent to proceed" in these post-conviction cases. The court ruled similarly with regard to Dr. Gur. The trial court denied any funding for Drs. Amador and First. The court concluded that Dr. Amador's testimony would have added little to the testimony of Drs. Woods and Gur. As to Dr. First, the court concluded that he was only a potential rebuttal witness.

In another *ex parte* motion filed on April 10, 2008, Reid renewed his requests for funding for all four experts. The trial court, however, adhered to its previous ruling. The court made the following comments regarding the funding already approved for Dr. Woods:

> The Court acknowledges that Dr. Woods will need some time to meet with counsel to prepare for the hearing. Further, the Court also notes that Dr. Woods will need time to review the reports of any state expert. Apparently, Dr. Woods is already familiar with the findings of Dr. Gur and will not be required to expend significant time to review Dr. Gur's report. Finally, it is possible Dr. Woods will have some type of rebuttal testimony following the presentation of the state's witnesses. However, the Court finds the allotted funds (10 hours) as granted in the previous Order are sufficient to perform these services.

> Much of [Reid's] argument focuses on potential state witnesses and the time estimated to rebut them. This motion to reconsider references Dr. Bernet and Dr. Martell. However, at this time, no disclosures have been made. Notwithstanding the disclosure deadline, [Reid] and Dr. Woods are intimately familiar with the findings of both Dr. Bernet and Dr. Martell. While it is possible that if these witnesses are indeed disclosed by the State each witness

may have some type of updated report or finding, it is not reasonable to conclude that the experts will start from scratch or present significantly different testimony (or opinion) from that previously given. Therefore, a request for funds for extensive time to review any subsequent report by a State expert witness is unfounded at this time. Should the State disclose a previously unknown witness to this case or present reports revealing unforeseen diagnoses, the Court would entertain the request for additional funds at that time.

As to the authorization of funds for Dr. Gur, the trial court stated that "[b]ecause Dr. Gur has adhered to his position relating to [Reid's] competency and has interviewed [Reid] as late as December 2007, further testing or evaluation is unnecessary for the purposes of the upcoming hearing." The court concluded that the funds previously authorized were sufficient to allow Dr. Gur to review other potential expert reports, consult with counsel and prepare for the competency hearing. The trial court, again, held that the anticipated testimony of Dr. Amador would have been "cumulative at best on the issue of [Reid's] competency." The court concluded that Reid "simply fail[ed] to establish a particularized need for the services of Dr. Amador in light of the additional experts requested." The trial court denied the renewed request for funding for Dr. First for the reasons previously stated.

Finally, in an *ex parte* motion filed on May 1, 2008, Reid again requested funding for all four experts. The trial court found that Reid had shown a particularized need for the proposed services of Dr. Woods and thus granted the full amount of the additional funds requested. The court also found a sufficient basis to grant additional funds for Dr. Gur. However, because Reid announced in open court that he would not be calling Dr. Gur as a witness to testify at the evidentiary hearing, the trial court considered moot the request for funds for Dr. Gur. The court adhered to the reasons for its previous denials of funds for Dr. Amador.

In his motion, Reid renewed his request for funding for Dr. First because the State had since indicated it would call Dr. Bernet as a witness. In addition to the proposed rebuttal testimony regarding the pseudologia fantastica diagnosis, Reid also sought funding for Dr. First "to evaluate the interviews of Dr. Bernet and Dr. Martell and offer [his] expert opinion regarding the content of those interviews and whether the conduct of the interviews [met] with acceptable standards within the psychiatric profession." The trial court again denied funding for Dr. First. The court observed that Reid's renewed request was "almost completely divergent from [the] initial request," having expanded from a rebuttal witness to "an expert witness with critiques of clinical method and testimony regarding 'pseudologia fantastica' and delusional disorder." As such, the trial court noted that Reid did not disclose

Dr. First as an expert witness, instead of merely a rebuttal witness, prior to the previously imposed deadline set by the court.

In closing, the trial court offered the following remarks:

[I]t is important to address the repeated requests for funds to conduct more evaluations of [Reid]. Although [counsel] sought funds in the initial request for further evaluations of [Reid] by his experts, the Court denied funds at that time. [Reid's] renewed motion filed on May 1, 2008 also included funds for additional evaluations, especially in light of the interviews conducted by the State's witnesses. [Reid] argued both in the ex parte motions and in the motion to strike [the anticipated testimony of Dr. Bernet] (heard in open court) that he had been unfairly and unconstitutionally denied the opportunity for further evaluations due in large part to funding denials. This Court disagrees.

The instant post-conviction proceedings were initiated by [Reid] with attachments claiming [he] was incompetent to proceed (Captain D's) and incompetent to timely file a post-conviction petition (McDonald's). The McDonald's claims were made in large part based on the reports/findings of Dr. George Woods and Dr. Ruben Gur. Both experts had examined [Reid] in December 2007 in another matter. These findings were used to make the claims of incompetency. Therefore, the State was entitled to have its experts conduct evaluations/interviews of [Reid]. Now, [Reid's] experts are being given the opportunity to compare the findings of the State's expert witnesses with their own findings.

The Court cannot continue to grant more and more evaluations and "rebuttal" evaluations. To do so would result in an endless cycle. Neither expert could reach a conclusion. Instead, the process would be mired in perpetual evaluations and resulting report review. Such a result could never have been contemplated by the state or federal constitution or by related case law. For these reasons, [Reid's] requests for more and more interviews and re-interviews have been denied.

Indigent petitioners in capital post-conviction proceedings are entitled to funding for expert or investigative services if the trial court, in its discretion, determines that the services are necessary to protect the constitutional rights of the petitioner. See Owens v. State, 908 S.W.2d 923, 928-29 (Tenn. 1995); Tenn. Code Ann. § 40-14-207(b); Tenn. Sup. Ct. R. 13, Sec. 5(a). The petitioner must demonstrate a particularized need for the services "by specific factual proof that the services of an expert or investigator are necessary to establish a ground

for post-conviction relief, and that the [petitioner] is unable to establish that ground for post-conviction relief by other available evidence." Owens, 908 S.W.2d at 929; see also Tenn. Sup. Ct. R. 13, Sec. 5(c)(3). On appeal, a trial court's decision regarding a request for expert funding is reviewed under an abuse of discretion standard.

Counsel are not complaining on appeal about any lack of funding prior to March 6, 2008. As the trial court observed, Reid had previously been evaluated by his own experts numerous times in the past and as recently as six months prior to the joint evidentiary hearing. In fact, Reid relied on the opinions of Drs. Woods and Gur in order to meet the required threshold showing prior to the full competency hearing conducted in these cases. As the State suggests, counsel only appear concerned that the State's experts were able to conduct the last evaluations of Reid prior to the evidentiary hearing.

Based upon our complete review of the records in the Davidson County cases, we cannot conclude that the criminal court abused its discretion in denying authorization for all of the requested funding by Reid. The trial court offered insightful and reasonable explanations for its actions on each of the *ex parte* motions filed by Reid. The trial court did not deny outright all additional funding for expert services, but only that which it found unnecessary.

In his briefs on appeal, Reid suggests he was precluded from presenting necessary and critical expert testimony as well as rebutting the State's expert testimony. Citing Panetti v. Quarterman, 551 U.S. 930 (2007) and Ford v. Wainwright, 477 U.S. 399 (1986), Reid suggests that the trial court in these cases based its determination of competency after having reviewed *only* the opinions of the State's experts. That suggestion is unfounded. Reid's extensive history of mental health evaluations, including those performed by experts of his own selection at the State's expense, has been recounted elsewhere in this opinion as well as the opinions in the many other appeals Reid has had before this Court and the supreme court. Moreover, the trial court, as is evidenced by its written order on the question of competency, clearly considered the testimony and reports of Reid's experts before arriving at its conclusion.

As discussed above, Supreme Court Rule 13 and the relevant case law permit a trial court to approve funding for expert services when necessary to ensure protection of a petitioner's constitutional rights, but only when the petitioner is unable to rely on other available evidence in support of his or her position. The trial court in these cases authorized funding for two experts, the same two experts Reid relied upon in crossing the initial competency threshold. Funding for Dr. Amador, a third expert witness, was not necessary to protect Reid's rights when his testimony would merely have been cumulative to the opinions held steadfast by Drs. Woods and Gur. The initial amount of funding authorized

45

for Drs. Woods and Gur in March 2008 was adequate given the extensive knowledge of Reid each expert already possessed as well as the consistent opinions they held about his incompetence. The trial court approved all of the additional funding for Dr. Woods which Reid requested in May 2008, and apparently would have done the same for Dr. Gur if Reid had still intended to call him as a witness. The fact that Reid subsequently declined to call Dr. Gur as witness does not, however, discredit the trial court's reasoning for its refusal to authorize payment for the services of Dr. Amador. As to the request for funding for Dr. First as a rebuttal witness, the fact that Dr. Bernet abandoned any diagnosis of pseudologia fantastica, as discussed above, rendered any rebuttal by Dr. First unnecessary.

Reid has failed to demonstrate how the trial court's actions as to funding prejudiced the presentation of his case in any way. Reid seems only to suggest that the State had an advantage because its experts were the last ones to personally evaluate Reid. As the trial court stated, however, the continual granting of repeated evaluations would have merely created an unnecessary "endless cycle." As our supreme court cautioned in Owens, a trial court's authority to authorize funding for expert services in capital post-conviction cases should not be interpreted as a "blank check." 908 S.W.2d at 923. The trial court in these cases appropriately approved those services for which it concluded Reid had established a particularized need. See Tenn. Sup. Ct. R. 13, Sec. 5(c). Both sides were afforded ample opportunity and means to present its position on the ultimate question: Reid's competency. This issue is without merit.

### Recusal of Trial Judge
### (Davidson County cases)

Reid contends Judge Blackburn should have recused herself from the Captain D's and McDonald's cases "in order to preserve the appearance of impartiality." In support of his claim for recusal in the McDonald's case, Reid offers the following statements: Judge Blackburn served as the original trial judge, and in denying the motion for new trial in the case, she commented that Reid "was represented by very competent attorneys who vigorously defended him in each of his cases" and "[who] made well-informed tactically-sound decisions throughout all of the proceedings in these cases and no experienced attorney would have done anything differently." According to Reid's argument on appeal, these statements suggested Judge Blackburn was predisposed to denying any claim of ineffective assistance of counsel in the post-conviction context.

In addition to the allegations regarding Judge Blackburn's conduct in the McDonald's case, Reid offers the following grounds (which are the same as those asserted in the motions he filed in the trial court) in support of his argument that Judge Blackburn should have recused herself in the Captain D's case: Judge Blackburn failed to sua sponte require an

46

evaluation of Reid's competency during the trial and her actions regarding the competency issue in the McDonald's case suggested her bias; Judge Blackburn's former employment with the Office of the District Attorney General should have raised an appearance of impartiality; Judge Blackburn denied the Office of the Post-Conviction Defender's request to solicit out-of-state pro bono assistance; and Judge Blackburn denied adequate funding for mental health experts.

The Supreme Court Rules provide, in pertinent part, the following reasons warranting a judge's recusal from presiding over a particular proceeding:

> A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:
>
> > (a) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding; [or]
> >
> > (b) the judge served as a lawyer in the matter in controversy, or a lawyer with whom the judge previously practiced law served during such association as a lawyer concerning the matter, or the judge has been a material witness concerning it[.]

Tenn. Sup. Ct. R. 10, Canon 3(E)(1)(a), (b) (asterisk omitted). With respect to these provisions, our supreme court instructs us as follows:

> Litigants, as the courts have often said, are entitled to the "cold neutrality of an impartial court." Thus, one of the core tenets of our jurisprudence is that litigants have a right to have their cases heard by fair and impartial judges. Indeed, "it goes without saying that a trial before a biased or prejudiced fact finder is a denial of due process." Accordingly, judges must conduct themselves "at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary," and "shall not be swayed by partisan interests, public clamor, or fear of criticism." As we said many years ago, "it is of immense importance, not only that justice be administered . . . but that [the public] shall have no sound reason for supposing that it is not administered." If the public is to maintain confidence in the judiciary, cases must be tried by unprejudiced and unbiased judges.
>
> Given the importance of impartiality, both in fact and appearance,

47

decisions concerning whether recusal is warranted are addressed to the judge's discretion, which will not be reversed on appeal unless a clear abuse appears on the face of the record. A motion to recuse should be granted if the judge has any doubt as to his or her ability to preside impartially in the case. However, because perception is important, recusal is also appropriate "when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." Thus, even when a judge believes that he or she can hear a case fairly and impartially, the judge should grant the motion to recuse if "the judge's impartiality might reasonably be questioned." Hence, the test is ultimately an objective one since the appearance of bias is as injurious to the integrity of the judicial system as actual bias.

Davis v. Liberty Mut. Ins. Co., 38 S.W.3d 560, 564-65 (Tenn. 2001) (citations omitted). This Court may reverse the trial judge's decision only when the judge has clearly abused his or her discretionary authority. State v. Cash, 867 S.W.2d 741, 749 (Tenn. Crim. App. 1993).

As Judge Blackburn aptly explained, the comments about defense counsel's representation she made in denying the motion for new trial in the McDonald's case were general in nature and in no way constituted a finding on counsel's performance under the Strickland v. Washington analysis. Indeed, Reid did not raise the issue of ineffective assistance of counsel in his motion for new trial. Thus, Judge Blackburn's comments had no bearing on Reid's subsequent ability to raise an ineffective assistance of counsel claim in the post-conviction context. Nor did they suggest that her impartiality in the instant post-conviction cases might reasonably be questioned. See Kennath Henderson v. State, No. W2003-01545-CCA-R3 CD, 2005 WL 1541855 at *28 (Tenn. Crim. App. 2005), perm. to app. denied, (Tenn., Dec. 5, 2005). Moreover, it is well-established that a judge is in no way disqualified because he or she tried and made adverse findings in previous litigation See State v. Hines, 919 S.W.2d 573, 578 (Tenn. 1996).

In his briefs, Reid summarizes the relevant law on the issue of recusal, which we have recited above. Reid's argument on appeal, however, consists solely of the following statement: "The court below should have recused from the case in order to preserve the appearance of impartiality." Reid fails to offer any specific explanation about how Judge Blackburn's denials of his motions to recuse resulted in any abuse of her discretion. Judge Blackburn issued written orders detailing the nature of each of Reid's complaints. The judge clearly set forth the reasons why she declined to recuse herself in each instance and thoroughly supported her conclusions with contextual explanations and sound legal reasoning. Our supreme court previously described the nature of appellate review under the applicable abuse of discretion standard: "An appellate court should not reverse for 'abuse of

discretion' a discretionary judgment of the trial court unless it affirmatively appears that the trial court's decision was against logic or reasoning, and caused an injustice or injury to the party complaining." Ballard v. Herzke, 924 S.W.2d 652, 661 (Tenn. 1996).

It is clear to us that Judge Blackburn carefully reviewed each ground asserted by Reid in support of his requests for recusal. As the State suggests, each of Judge Blackburn's orders demonstrate scrupulous compliance with the legal rights of both parties as well as the trial court's own statutory and ethical duties. Reid has simply failed to show how the trial judge's actions were an abuse of her discretion. Having carefully reviewed the records on appeal in light of the complaints asserted by Reid, this Court cannot conclude that Judge Blackburn abused her discretion by denying the requests for recusal. This issue is without merit.

### Findings of Competence

Finally, Reid challenges the findings of competence rendered by the Davidson and Montgomery County trial courts. Reid argues that the proof presented in these cases overwhelmingly demonstrated that he cannot make rational decisions about his legal proceedings. Reid basically contends that the trial courts' reliance upon the diagnoses and opinions of Drs. Bernet and Martell was against the weight of the sum of the evidence presented. According to Reid, and in support of his argument on this issue, the State would have insisted on evidentiary hearings in the parallel federal court proceedings had there been any serious doubt about his competency. The State counters that the findings by each of the two trial courts are fully supported by the records.

As we discussed earlier, Reid bore the burden of proving his incompetency by clear and convincing evidence. Reid, 197 S.W.3d at 705; see Tenn. Code Ann. § 40-30-110(2)(f). That burden is satisfied by evidence which eliminates any serious or substantial doubt about the correctness of the conclusions to be drawn therefrom. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App.1998). As discussed earlier, in order to allow his "next friend" to pursue relief on his behalf Reid was required to prove that he was incompetent in the McDonald's and Baskin-Robbins cases during the one year limitations period imposed by the Post-Conviction Procedure Act. In the Captain D's case, in order to allow the acceptance of the amended petition filed by counsel Reid had to prove he was incompetent at the time of the evidentiary hearing.

In an appeal of a ruling in a competency hearing, questions of law are reviewed de novo with no presumption of correctness. State v. Irick, 320 S.W.3d 284, 292 (Tenn. 2010). Our supreme court has held, however, that a trial court's finding on the issue of competency is reviewed as a question of fact and will be presumed correct unless the evidence in the

record preponderates against that finding.  Id.  Cf. Tenn. Sup. Ct. R. 28, Sec. 11(C) ("The issue of competency will be reviewed as an issue of fact and the trial court's finding will be presumed correct, unless the evidence in the record preponderates against it.").  On appeal, Reid bears the burden of demonstrating that the evidence preponderates against the trial courts' findings in these cases.  Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997).

It is well-settled that this Court may not re-weigh or reevaluate the evidence or substitute its inferences for those drawn by the trial courts.  State v. Nichols, 90 S.W.3d 576, 586 (Tenn. 2002) (citing State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)).  Furthermore, the credibility of the witnesses, and the weight and value to be afforded their testimony, are questions to be resolved by the trial courts.  Bates v. State, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997).

Both of the trial courts in these three cases issued comprehensive orders detailing their findings on the ultimate issue of Reid's competency.  The courts thoroughly summarized the evidence presented at the two evidentiary hearings, including the various reports of the expert witnesses as well as the other exhibits introduced.  In addition, as we have already held, both courts correctly recited the applicable law which governed their decisions in these matters. In the end, however, both the Davidson and Montgomery County courts concluded that Reid was competent to manage his personal affairs and to understand his legal rights and liabilities.  The petitions filed by the "next friend" were, therefore, dismissed for lack of standing.  In addition, the amended petition filed by counsel in the Captain D's case was also dismissed.  In order to accurately convey how each trial judge arrived at their conclusions, we will quote extensively from their written orders.

The Montgomery County trial court issued the following findings and conclusions:

> First, the Court must consider the testimony in light of the first prong of the Nix (civil competency) standard.  Here, [Reid] was incompetent under Nix if he was unable to manage his personal affairs during the statutory limitations period. . . .
>
> [Reid's] permanent residence at the state penitentiary, whether Riverbend or Brushy Mountain, greatly restricts the freedoms relating to his every day life. . . . However, it is clear [Reid] carries out essential activities including his nutrition and personal hygiene. [Reid] also consistently engages in a workout routine during his designated yard time. Without question [Reid] has little property or holdings to manage; however, he maintains an account with the prison commissary through which petitioner makes decisions about which items he will purchase with his account balance.

50

Even in light of the structured setting, both Dr. Bernet and Dr. Martell opine that [Reid] is able to manage his personal affairs. From their conversations with [Reid], they conclude that [he] makes daily decisions, however minimal, about his nutrition, his recreation time, and his television time. Dr. Woods, on the other hand, admits that [Reid] may be able to make certain basic decisions about his daily activities, but does so only at the direction of scientific technology. Dr. Woods explained that the nature of the technology delusions are so invasive that [Reid] believes technology plays a part in every decision he makes. As an example, Dr. Woods noted that [Reid] believes money goes into his commissary account only when the technology allows. In his opinion, these technology delusions affect [Reid's] ability to manage his personal affairs.

Dr. Martell and Dr. Bernet conclude that [Reid] was competent during the statutory time period to manage his personal affairs. Dr. Woods found that [Reid] was not competent to do so. Notwithstanding the limitations presented by prison life, the Court finds no basis to find a significant impairment, if at all, in [Reid's] functional or decision-making capacity to manage his personal affairs. Taking [Reid] where we find him, he has the ability to make daily decisions about his nutrition, his appearance (including physical fitness) and his television viewing choices. Nothing in the testimony indicated [Reid] had any true difficulty in performing these daily activities or in his decisions related to performing those activities.

[Reid] bears the burden of proving his incompetence during the statute of limitations period by clear and convincing evidence. As to this first Nix prong, the court finds he has failed to meet his burden.

The more difficult analysis relates to the second prong of Nix which provides that [Reid] was incompetent during the statutory period if he was unable, during the one-year period, to understand his legal rights and liabilities. . . .

. . .

The Court finds from the testimony that [Reid] perpetuates these thoughts, fantasies or delusions about scientific technology. Certainly, it is troublesome when [Reid] references the role of technology in his legal process by telling a given expert that the trials were mock or that his lawyers and participants were actors. It appears [Reid] goes into more detail with some

51

experts than he does with others and dwells on the technology thoughts or delusions to a differing degree depending on his audience.

However, the Court finds that, even with these references to technology and mock trials and actors, [Reid] has a firm grasp on the procedural posture of his cases and did so during the limitations period. He understood the direct appeals process describing it as automatic and understood that the post-conviction phase required some action. Admittedly, [Reid's] understanding of his recent procedural history is erroneous in some respects but the errors are not based on some mental disorder or defect. These "honest" errors are similar to those errors attributable to the various parties involved in the procedural journey into substantially unchartered territory. The Court places no significance on [Reid's] technical errors relating to his recent competency and related proceedings in his three cases in two different courts.

It is interesting to note that Dr. Martell said [Reid] has maintained for years that he would not pursue post-conviction "appeals." These long-held choices are supported in the record. [Reid] has a great ability to recite the specifics of his cases, including the present Baskin-Robbins case. [Reid] has also discussed pros and cons of having a new trial. He explained to Dr. Bernet that he did not want a new trial and did not want the witnesses to come back in and say those things about him.

Even though Dr. Woods (and to some degree Dr. First) concede [Reid] has the ability to make certain minimal decisions, they do so against the backdrop of the scientific technology delusion. Of course, as noted, not all of the experts conclude [Reid] is suffering from delusions. Both Dr. Martell and Dr. Bernet indicate [Reid] has, even with repeated references to the delusions or fantasies or scientific technology, an understanding of his legal rights and liabilities. The Court accredits their testimony in this regard.

Viewing the record as a whole, the Court concludes [Reid] has consistently spoken of scientific technology over the years, including his years in the Texas legal system and at the time of the instant trial. Therefore, claims of delusions are not new to [Reid's] history. While varying diagnoses were made in Texas, [Reid] was deemed competent to stand trial in the instant case. The Court recognizes that competency can change over time. Our appellate courts also understand that competency can not only evolve but may, when questioned, require different considerations at different levels of a criminal

52

case. Here, they found the Nix civil competency standard most aptly fits the present circumstances.

When applying the facts of this case to the considerations described in the Nix standard, the Court must conclude that [Reid] has failed to meet his burden of establishing (by clear and convincing evidence) that he is either unable to manage his personal affairs or understand his legal rights and liabilities.

The Davidson County trial court entered separate orders in the Captain D's and McDonald's cases. The following is the trial court's findings and conclusions. The two orders are quite similar. Any relevant differences will be highlighted.

Even though all three experts reach different conclusions, the Court must analyze their respective diagnoses under the Nix competence standard. The Nix standard in the instant context first provided that [Reid] is incompetent to proceed with his post-conviction proceedings if he is unable to manage his personal affairs.

. . .

Here, the Court acknowledges that [Reid'] structured prison environment alters, in some respects, the analysis of [Reid's] ability to manage his personal affairs. However, [Reid's] daily activities give insight into his thought processes as evidenced in his interviews with the various experts.

. . .

Both Dr. Bernet and Dr. Martell conclude that [Reid] is competent to manage his personal affairs. Dr. Bernet found [Reid's] responses very logical and rationally based. Of course, both Dr. Bernet and Dr. Martell note that if Susan is fictitious, the naming of her as his beneficiary would not be a reasonable decision. Notwithstanding the testimony about his will, [Reid] spoke of his daily activities relating to, among other things, his hygiene, fitness and nutrition, correspondence and journal writing. These responses illustrate [Reid's] understanding of his personal affairs and the limitations placed on such an analysis by his incarceration. . . .

Dr. Woods testified that [Reid] can accomplish certain basic tasks but noted that these functions are impaired by scientific technology. He said the technology affects [Reid's] bodily functions, his ability to eat, his ability to

sleep and his reading. When asked how he reached these conclusions, Dr. Woods could not recall his source or reference point. He said [Reid] may have told him or had related these opinions in affidavits prepared by counsel and staff. The Court notes that Dr. Martell's interview contained references by [Reid] to the effects of scientific technology on his daily activities. Dr. Woods concluded that "personal affairs" also includes "legal affairs." He testified that [Reid] does little to manage his legal affairs, including [Reid's] decision not to read anything about his case or otherwise assist in his case. He said any understanding [Reid] exhibits is merely [Reid] parroting what he has been told or has heard. Based on these conclusions, Dr. Woods opined that [Reid] was incompetent under Nix to manage his personal affairs.

In weighing these various perspectives, the Court places significance on the consistency in [Reid's] responses to both Dr. Bernet and Dr. Martell. It is interesting to note that during his interview with Dr. Bernet, [Reid] made little or no mention of the effects of technology on his daily activities, his thinking or his hearing. However, during his interview with Dr. Martell, [Reid] referenced the pervasive nature of the scientific technology in most aspects of his life. As noted Dr. Woods insists [Reid] has no abilities other than what scientific technology permits him to do.

Viewing the record as a whole, the Court finds [Reid] is not incompetent under Nix to manage his personal affairs. The Court finds [Reid's] self-asserted responses to Dr. Bernet to be informed and well reasoned. Though the scope of his activity is limited, [Reid] understands he has choices to make and reasons through each choice. [Reid] illustrates a rational understanding of his personal affairs and applies a rational decision-making process in making his choices.

Dr. Woods' broad brush is disingenuous under this first Nix prong; therefore, the Court finds his testimony not to be credible on this specific issue. Rather than giving a concession when a response by [Reid] was genuine, Dr. Woods explains away objectively reasonable testimony as being rendered at the hand of scientific technology. The record does not bear out such a conclusion. Certainly, Dr. Martell's interview contained certain references to certain daily activities being affected by technology though perhaps not to the degree recited by Dr. Woods. However, Dr. Martell who has also [had] a lengthy history with [Reid] and has seen [Reid] at perhaps his worst (2006 federal habeas corpus) and his best (1999-2000 trial), concluded [Reid] is competent to manage his personal affairs. He reached this conclusion even

though [Reid] exhibited the type of conduct (and delusional thoughts) in the interview conducted by Dr. Martell as that conduct described by Dr. Woods as being the basis for finding [Reid] incompetent.

As to Dr. Wood's conclusions that "personal affairs" include "legal affairs," the Court finds no support for such a combination. However, even if the term "legal affairs" is implicitly included in the Nix prong related to management of personal affairs, no testimony was presented to convince the court that [Reid] was unable to manage his "legal affairs." Therefore, the Court finds [Reid] (via next friend applicant Linda Martiniano) has failed to meet his burden of establishing that [Reid] is incompetent under *Nix* to manage his personal affairs.

The second prong or consideration of Nix is that [Reid] is incompetent if he is unable to understand his legal rights and liabilities. . . .

. . .

As with the discussion under the first Nix prong, the analysis is made more difficult by the experts' different conclusions. Here, the Court must decide whether [Reid] understands his legal rights and liabilities. In the present context of the Captain D's case, [Reid's] primary legal "rights" include an ability to file an amended post-conviction petition with the aid of appointed counsel. Typically, an amended petition includes an expansion of some of the issues raised in the *pro se* petition along with additional issues. Of course, the "liabilities" could include, among other things, not being able to supplement his *pro se* petition and be limited in some respects as to the scope of his post-conviction review. Obviously "liabilities" could include the consequences of not seeking adequate post-conviction review and eventually facing lethal injection should he not prevail in the courts. [In the present context of the McDonald's case, [Reid's] legal "rights" include an ability to file for post-conviction relief within the one-year statutory limitations period. It is clear from the lengthy record that [Reid] was certainly aware of the post-conviction process and the mandates of the statute. In fact, dating back to the time of trial, [Reid] expressed his understanding of the post-conviction process when he told Dr. Martell that he planned to forego the post-conviction tier when his automatic direct appeals process was completed.]

Reflecting on the initial Rule 28 inquiry, the Court engaged [Reid] in a series of questions about his understanding of his cases. As the transcript

illustrates, [Reid] had a remarkable grasp of his three complex capital cases. As an example, [Reid] was asked why he was choosing to withdraw his *pro se* post-conviction petition in the Captain D's case. First, he recognized that his direct appeals were mandated by law. He then responded that he had given some initial thought to withdrawing his petition but understood that he had an execution date set in the subsequent McDonald's case. He recognized that because he had an execution date in the McDonald's case (and assuming he filed no post-conviction petition in the McDonald's case) his desires would be accomplished. However, when the McDonald's execution date did not materialize, he recognized the need to withdraw the Captain D's petition so as to put that case on the execution track. The responses reflected a rational understanding by [Reid] of his legal position.

Turning to the instant matter, [Reid] was asked by Dr. Bernet about his legal position. Although some of his responses were erroneous he essentially understood the nature of the "appeals" in a post-conviction setting. He also erroneously indicated that both experts at the Rule 28 proceedings had found him incompetent. The court finds no significance in these errors.

Many of the post-conviction competency proceedings in this series of cases have been issues of first impression in Tennessee. On many occasions the parties have had an incomplete or inaccurate understanding of the rulings and/or proceedings. It is not surprising then that [Reid] was erroneous about his understanding of how the federal habeas proceedings were instituted and his sister's role in those proceedings. Similarly, [Reid] erroneously believed both experts found him incompetent in the Rule 28 proceedings. Because even the parties have had some difficulty in sorting through these new challenges and in interpreting the Court's orders, the Court cannot overly interpret [Reid's] technical misunderstanding of the posture of his case. It is clear from the reading of the experts' reports and/or interviews that they did not have a complete grasp of the current legal proceedings. However, any ambiguity was clarified at the competency hearing with each expert being informed of the present posture and being asked their respective opinions in light of that posture.

What is clear from the testimony and evidence presented is that [Reid] had a basic understanding of the post-conviction phase. He knew post-conviction proceedings followed the mandatory direct appeals process and he knew that the post-conviction proceedings were initiated by him by the filing of a petition. [Reid] expressed some confusion about how the post-conviction

hearing would progress or the possible results of the Court's finding as to competency. [Reid] knew that at some point he could face electrocution again and "go on to heaven."

[[In the pro se petition he filed in the Captain D's case, Reid] also expressed some understanding of the nature of a post-conviction hearing when he said he recognized errors in trial counsel's performance relating to the shoe prints and the change taken from his residence. He indicated counsel should have challenged the shoe print evidence and the issue relating to the money found at his home versus the sum of money taken in the robbery. These examples reflect [Reid's] understanding of two relevant and valid post-conviction issues.]

Even with this recognition and the potential for a new trial, [Reid] maintained his desire not to proceed with the post-conviction. Dr. Bernet discussed with [Reid] in great detail the pros and cons of having a new trial. [Reid] cited both pros and cons but eventually concluded that he did not wish to have a new trial. In his explanation to Dr. Bernet he said he did not want the witnesses to come in and say those things about him again. Dr. Martell said [Reid] has always maintained (since the time of trial) that he would permit the direct appeals process to continue because it was mandatory in a capital case. However, Dr. Martell noted that [Reid] maintained even then that he would choose not to file for post-conviction relief.

Without reference to delusions or scientific technology, [Reid] has some understanding of his legal rights and liabilities. Further, without using the precise legal terms, he understands a post-conviction proceeding is in some form an "appeals" process. He also understands he could be granted a new trial if he wins during post-conviction. [Reid] also knows that he could face lethal injection if he loses his post-conviction or chooses not to proceed with his post-conviction.

One of the concerns before the Court centers around [Reid's] responses relating to the 10 to 12 year sentence (also referred to as 8 to 10 year sentence), the mock trials and actor participants, [and] actual implementation of the death penalty. Certainly, peripheral issues exist including [Reid's] fiancee Susan and [Reid's] purported will designated her as beneficiary. However, these issues relating to his legal position and his legal rights and liabilities present the most significant inquiry.

On this definitive issue, the Court is faced with three different opinions. Based on the evidence presented, Dr. Woods opines that [Reid] is delusional and therefore has no ability to understand his legal rights and liabilities due to the deep entrenchment of the delusional system. Second, Dr. Martell opines that [Reid] is delusional but concludes that the delusions do not impair [Reid's] basic understanding of his legal rights and liabilities. Finally, Dr. Bernet opines that [Reid] is not truly delusional but instead is a repetitive or habitual liar. Dr. Bernet also concludes that even if [Reid] had lied to such an extent that he now believes the lies to be truth, [Reid] is nonetheless competent to understand his legal rights and liabilities.

The Court was faced with a similar dilemma in the Rule 28 proceedings. The Court was faced with two diverging opinions about [Reid's] competency either of which was supported by the evidence. In this proceeding, the Court is again faced with the same two experts adhering to essentially the same opinions as rendered in the Rule 28 proceeding. Of course here the interviews and examinations focused on the <u>Nix</u> competence standard rather than the <u>Rees</u> competency standard. Further, in these proceedings the court heard from a third mental health professional who, as noted, believes [Reid] is delusional but that the delusions do not affect his understanding of his legal rights and liabilities. Again, there is evidence to support all three positions.

As perplexing as the present scenario seems, the Court notes distinct differences. In the instant case, our appellate courts have clearly adopted the *Nix* competency standard to not only apply in these types of proceedings but to this specific case. Further, the Tennessee Supreme Court also provided that [Reid] has the burden of proving incompetency by clear and convincing evidence, i.e., that there is no substantial doubt about the correctness of the conclusion drawn.

In this case, the Court concludes that [Reid] has an understanding of his legal rights and liabilities. This is evidenced in his responses to both Dr. Bernet and Dr. Woods. However, the interplay between his understanding and the effects, if any, of the delusions or thoughts or fantasies about scientific technology on his understanding when inserting the descriptive term "rational" creates what this Court believes to be the seminal issue – does [Reid] have a rational understanding (in light of the delusions or fabricated stories that perhaps have become the "truth" to [Reid]) of his legal right and liabilities? Does this interplay eliminate any serious or substantial doubt concerning the

58

correctness of the conclusion that [Reid] is incompetent based on the evidence?

The Court finds that all three experts present arguable viable theories as to [Reid's] mental competency even though none are in agreement. This Court cannot discount [Reid's] underlying thoughts relating to scientific technology. These representations have been made since the time of trial at which [Reid] was deemed competent to stand trial (McDonald's) even in light of these thoughts or delusions. Dr. Woods believes the delusions have existed since the time of trial and continue to expand thereby resulting in a further deterioration of [Reid's] mental competency. Dr. Bernet opines that the scientific technology references are fabrications that have taken a life of their own but do not interfere with [Reid's] competence under *Nix*. Dr. Martell's findings provide an interesting contrast between these two diagnoses.

Dr. Martell, as do Dr. Bernet and Dr. Woods, has a significant historical relationship with [Reid's] case. Dr. Martell concluded in 2000 that [Reid] suffered from delusional disorder but was competent to stand trial under the Dusky standard (McDonald's). In 2006, Dr. Martell examined [Reid's] competency under the Rees standard and concluded that [Reid] continued to suffer from delusional disorder but that the condition was exacerbated since the time of trial to such a degree he was at the time incompetent. Now, Dr. Martell finds [Reid] to be competent under the Nix competence standard.

All three experts provide an interesting examination of [Reid's] mental health status over time. Dr. Martell is somewhat unique in that he has observed [Reid] during the best of times but also in the worst of times. He has conceded various points but has maintained his position on many aspects of [Reid's] competency. An objective expert provides useful assistance to the court when he or she can step out of the advocate role to serve as an aid to the fact-finder. To some degree all have attempted to do so. However, Dr. Martell's analysis of [Reid's] condition was illustrated in a meaningful way with a simple but poignant analogy.

Dr. Martell said he described [Reid's] delusions at the time of trial as being present but being wholly contained in a suitcase that [Reid] carried with him. When he examined [Reid] in 2006, he said the suitcase had been opened and the delusions were no longer contained. He attributed the opening of the suitcase to stressful situations encountered by [Reid] at that time including perhaps his move to Brushy Mountain, a facility despised by [Reid]. The

59

opening of the suitcase allowed the delusions to greatly affect [Reid's] thought processes and as found by Dr. Martell affected his competency at that time to make rational decisions. Dr. Martell said that in 2008 [Reid's] condition has improved since 2008 [sic]. Using his analogy, he explained that [Reid] was trying to close the suitcase back. He later described it as two suitcases – one with rational thoughts in one hand and one with irrational thoughts in the other.

Dr. Martell has witnessed perhaps a greater dynamic than any other expert involved in that he has the benefit of the long history with [Reid] since the time of trial. This dynamic provides useful insight for the Court in making this competency determination. Of course Dr. Woods maintains the delusions are so pervasive [Reid] has essentially no ability to make decisions. Dr. Bernet, who also has a long history with [Reid], has weighed the possibility of these thoughts being delusions or lies and obviously concluded they are lies but nonetheless do not affect [Reid's] ability to make rational decisions. It is interesting that Dr. Martell having observed this dynamic, including a time when [Reid's] thoughts were completely consumed by the scientific technology thoughts and recognizing the continued presence of those same thoughts, nonetheless finds he is now competent to make rational choices about his legal rights and liabilities even with the presence of the delusions.

The issues of delusions of thoughts (verbalization, fantasies or stories) of scientific technology upon [Reid's] mental process have existed since the time of trial. Therefore, the Court is not addressing a mental health problem suddenly unearthed. What has changed is [Reid's] present legal posture, the legal competency standard (applicable at this stage), and the experts' opinions as to how these scientific technology references should be characterized and what affect they have on [Reid's] ability to have a rational understanding of his legal rights and liabilities.

The Court does not easily dismiss some of [Reid's] responses relating to technology and his capital case matters. It is troublesome of course that some of his references, if believed, indicate he possibly does not understand his legal position claiming the trials were mock, that the participants were actors and that he may be under a 10 to 12 year sentence rather than the death penalty. Taken in isolation these remarks reflect why Dr. Martell had difficulty in reaching his conclusions under the second prong of *Nix*. During his testimony, Dr. Martell was quick to assert that his findings were based on the *Nix* competency standard. Implicit in that insistence is the possibility that

60

the result may have been different under a different competency standard. The court is of the same opinion.

Notwithstanding these concerns, the Court understands there may always be differing opinions about [Reid's] competency. However, the Court's obligation here is to weigh the evidence in light of the Nix competency standard. While the evidence is not completely settled, the Court must conclude that in light of the applicable Nix standard and [Reid's] burden of proving by clear and convincing evidence his incompetency to proceed on his Captain D's petition [and file for post-conviction relief during the statutory limitations period in the McDonald's case], [Reid] (here through his next friend) has failed to meet his burden on both prongs. [FN: The court notes that the result could be different under a different competency standard or a different burden of proof. However, the Court recognizes that our appellate courts have noted that different competency standards apply at different stages of a criminal matter.] That is, the Court cannot eliminate any serious or substantial doubt concerning the correctness of the conclusion of [Reid's] incompetence based on the evidence. There is substantial credible evidence before the Court that [Reid] is competent. Therefore, based on the evidence, there is substantial doubt that [Reid] is incompetent under Nix.

Both trial courts acknowledged Reid's extensive mental health history. As noted earlier, Reid challenged his competency at trial in both the McDonald's and Baskin-Robbins cases, and he presented evidence relating to his mental health as mitigation in the penalty phases at each of the three trials. Reid has maintained over the years that he has been the subject of a surveillance operation conducted by the government referred to as "scientific technology." Nevertheless, both the Montgomery and Davidson County trial courts concluded that Reid failed to prove by clear and convincing evidence that he was unable to manage his personal affairs or understand his legal rights and liabilities.

Reid's argument on appeal focuses on his mental health. The question at the heart of these cases, however, is whether the condition of his mental health affected his ability to manage his personal affairs or understand his legal rights and liabilities during the relevant periods of time. "[M]ental illness is not the equivalent of mental incompetence." Nix, 40 S.W.3d at 463. Moreover, competency to forego post-conviction relief is not measured the same as competency to stand trial or even competency to terminate post-conviction relief. This Court must recognize the different standards of competency established by our supreme court which took into account the unique due process concerns occurring at different stages of a criminal proceeding.

61

Again, the findings of competence by the trial court are presumed correct unless the evidence in the record preponderates against those findings. Irick, 320 S.W.3d at 292. This Court may not re-weigh or reevaluate the evidence or substitute its inferences for those drawn by the trial courts. Nichols, 90 S.W.3d at 586. Furthermore, the credibility of the witnesses, and the weight and value to be afforded their testimony, are questions to be resolved by the trial courts. Bates, 973 S.W.2d at 631.

This Court has reviewed the records and summarized above the testimony of the several experts who evaluated Reid and reviewed the reports of his extensive mental health history at various times since the beginning of these cases. Each expert offered differing diagnoses and varying opinions about the extent to which Reid's alleged delusions impacted his abilities under the Nix analysis. Dr. Woods opined that Reid was delusional and that his delusions were so invasive that Reid was rendered incompetent. Dr. First also opined during the Montgomery County hearing that Reid's delusional disorder rendered him incompetent. Dr. Martell opined that Reid suffered from a delusional disorder, but he concluded that Reid's delusions did not affect his ability to understand his legal rights and liabilities. Although Dr. Bernet originally diagnosed Reid with a delusional disorder, Dr. Bernet had since changed his opinion about Reid. According to Dr. Bernet, Reid fabricated his delusions, and was thus competent under the applicable standard. Both Drs. Martell and Bernet believed Reid understood his fundamental rights, including the right to pursue post-conviction relief. Reid was able to describe the procedural history and current status of his three cases. Furthermore, Reid understood that if he was successful at post-conviction he could possibly be granted new trials, but if he was unsuccessful his cases would move toward imposition of the death penalty. The opinions of each mental health expert had some evidentiary support. Two of the experts, however, opined that Reid was competent under the applicable Nix standard, and both trial courts accredited the testimony of those two experts.

Reid was required to prove his incompetency during the relevant periods of time for each case by clear and convincing evidence. The trial courts concluded that he failed to do so. Both judges recognized that Reid's state of competence changed over time. They further recognized that their findings may have been different if they had been required to determine Reid's competency under a different standard. Both trial courts found, however, based upon their view of the evidence presented, that Reid was competent under the Nix standard and that his "next friend" could not, therefore, intervene in these post-conviction proceedings.

This Court cannot conclude that the evidence presented at the hearings preponderates against the findings of the trial courts. As quoted above, both judges explained in detail the reason for their findings. Contrary to Reid's argument on appeal, those findings are supported by credible evidence contained in the records. Drs. Woods, Bernet, Martell and Dr. First (Baskin-Robbins case) were each qualified as experts in their fields of study and

each of them offered detailed explanations concerning their diagnoses of Reid. Nevertheless, the trial courts made their own credibility determinations, and they afforded greater weight to the testimony of Drs. Martell and Bernet than that of Dr. Woods or Dr. First (Baskin-Robbins case). Those decisions were appropriately resolved by the trial courts. <u>Bates</u>, 973 S.W.3d at 631. This issue boils down to a battle of qualified experts, and the trial courts based their findings on the testimony of Drs. Bernet and Martell. The record supports the decisions of the Montgomery and Davidson County trial courts, and those decisions must, therefore, be presumed correct. This issue is without merit.

## CONCLUSION

For the foregoing reasons, we conclude that Reid failed to prove by clear and convincing evidence that he was incompetent during the relevant statutory limitations periods in the McDonald's and Baskin-Robbins cases and at the time of the evidentiary hearing in the Captain D's case. The post-conviction court, therefore, properly dismissed the petitions for post-conviction relief filed by the "next friend" in the McDonald's and Baskin-Robbins cases and the amended petition filed by counsel in the Captain D's case. Accordingly, we affirm the judgments of the Montgomery and Davidson County trial courts in these three post-conviction proceedings.

_____
DAVID H. WELLES, SPECIAL JUDGE